## Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x

DAMIAN BATISTA and SANDRA BATISTA,

               Plaintiffs,

- against -          Case No.: 1:26-cv-2557-JSR

EDELMAN SCHWARTZ PLLC, ZEV

SCHWARTZ, 1915 REALTY LLC,

BINOYMIN HERZL, and YONAH ROTH,

               Defendants.

-----------------------------------------------x

REMOTE DEPOSITION

OF

DOVID KLEINER,

appearing on behalf of one of the

Defendants herein,

1915 REALTY LLC

HELD:  Thursday, June 18, 2026

10:35 a.m. – 4:54 p.m.

JOB # J15022599

## Page 2

THIS IS THE REMOTE DEPOSITION OF DAVID KLEINER, appearing on behalf of the DEFENDANT herein, 1915 REALTY LLC, produced pursuant to ORDER, on THURSDAY, JUNE 18, 2026, before MICHELLE TROY PARRISH, Court Reporter and Notary Public in and for the State of New York.

         * * * * * * *

## Page 3

A P P E A R A N C E S

(ALL PARTIES APPEARED REMOTELY)

THE LAW OFFICE OF AHMAD KESHAVARZ

Attorneys for Plaintiffs

DAMIAN BATISTA and SANDRA BATISTA

16 Court Street, 26th Floor

Brooklyn, New York

11241-1026

718-522-7900

BY:  AHMAD KESHAVARZ, ESQ.

ahmad@NewYorkConsumerAttorney.com

-AND-

BRONX LEGAL SERVICES

Attorneys for Plaintiffs

DAMIAN BATISTA and SANDRA BATISTA

349 East 149th Street

Bronx, New York 10451

718-928-3700

BY:  JACKIE SPENCER, ESQ.

## Page 4

GOLDBERG SEGALLA

Attorneys for Defendants

EDELMAN SCHWARTZ PLLC and ZEV SCHWARTZ

711 Third Avenue, #1900

New York, New York 10017

646-292-8700

BY:  ANDREW REYNARD, ESQ.

areynard@goldbergsegalla.com

BERRY LAW PC

Attorneys for Defendant

1915 REALTY LLC

745 Fifth Avenue, 5th Floor

New York, New York 10151

212-355-0777

BY:  ERIC W. BERRY, ESQ.

eric.berry@berrylawnewyork.com



Page 5

I N D E X

TO TESTIMONY

WITNESS:  DOVID KLEINER

EXAMINATION BY                                    PAGE

MR. KESHAVARZ                                        15

---

Page 7

I N D E X

TO EXHIBITS MARKED (Continued)

PLAINTIFF'S     DESCRIPTION                          PAGE

Exhibit F       Series of 1915 Realty LLC            181
                Bills addressed to Damian and
                Sandra Batista,  consisting
                of 9 pages,

Exhibit G       Petition Non-Payment Dwelling        200
                document, Index No.
                LT-310915-25/BX,  consisting
                of 36 pages Bates stamped
                1915_000053 through 88

Exhibit H       Photocopy of a handwritten           222
                letter dated 06-30-24 to 1915
                Realty LLC signed by Damian
                Batista, consisting of 2
                pages Bates stamped
                1915_000611 through 612

Exhibit I       Photocopy of a handwritten           229
                letter dated 07-24-24 to 1915
                Realty LLC signed by Damian
                Batista with photocopy of
                front and back of envelope
                reflecting document was sent
                via Certified Mail #7012 3460
                0002 6783 1136, consisting of
                4 pages Bates stamped
                1915_000613 through 616

Exhibit J       Photocopy of a handwritten           233
                letter dated 10-11-24 to 1915
                Realty LLC signed by Damian
                Batista, consisting of 2
                pages Bates stamped
                1915_000617 through 618

Exhibit K       Series of documents,                 235
                consisting of 4 pages Bates
                stamped 1915_000619 through
                622

---

Page 6

I N D E X

TO EXHIBITS MARKED

(All exhibits hyperlinked to transcript, unless
        indicated otherwise below)

PLAINTIFF'S     DESCRIPTION                          PAGE

Exhibit A       Housing Assistance Payments           64
                Contract, consisting of 2
                pages Bates stamped
                1915_000015 to 16

Exhibit B       New York City Housing                 92
                Authority Leased Housing
                Department Certification of
                Completed Repairs, consisting
                of 1 page Bates stamped
                1915_000554

Exhibit C       New York City Housing                100
                Authority Leased Housing
                Department Landlord
                Certification for Conditional
                Permission for a Family
                Member/Additional Person to
                Live with a Section 8 Family,
                consisting of 2 pages Bates
                stamped 1915_000556 and 557

Exhibit D       New York City Housing                107
                Authority Leased Housing
                Department Certification of
                Completed Repairs, consisting
                of 1 page Bates stamped
                1915_000563

Exhibit E       New York City Department of          177
                Finance Office of the City
                Register document, Document
                ID: 2026042101004001 dated
                12-10-2024, consisting of 12
                pages

---

Page 8

I N D E X

TO REQUESTS

DESCRIPTION                                         PAGE

Mr. Keshavarz requests production of                110
documents related to the Section 8
program that Mr. Kleiner had submitted
to government agencies using an alias
such as David David, David Green, or
whatever it is he uses

Mr. Keshavarz requests production of                227
any documents reflecting when
correspondence was sent to Section 8
and when it was received back,
specifically including lease renewals
for Section 8 and specifically
including the lease renewal reflected
in document Bates stamped 611

Mr. Keshavarz requests production of                228
any system that the company has
generally to track correspondence
coming in and going out, including
Section 8

Mr. Keshavarz requests production of                233
anything indicating whether Witness
sent any proof to the Batistas of
their continuing residence

Mr. Keshavarz requests Witness check                235
to see if DKCK provided Mr. Batista
the information that he requested in
Exhibit J



Page 9

I N D E X
TO INSERTS

BY & DESCRIPTION                                        PAGE

MR. KESHAVARZ - Blank line left in           49
record for properties or corporations
that DKCK has managed from 2021 to
present and then which ones they
currently manage

MR. KESHAVARZ - Blank line left in          159
record for digitally scanned
information from DHCR stored

MR. KESHAVARZ - Blank line left in          225
record for when, if ever, Witness sent
lease renewal to Section 8 during this
time period

MR. BERRY - Blank line left in record       237
for response to question "Did you take
the action requested on page 619"

MR. KESHAVARZ - Blank line left in          243
record for response to question, "Has
the amount of work that you give to
Edelman Schwartz changed at all since
this FD CPA suit?"

MR. KESHAVARZ - Blank line left in          245
record for response to question, "When
you sued my client and during the
course of the lawsuit, in fact,
whether my client owed any money?"

Page 10

REMOTE OATH BY REPORTER ACKNOWLEDGMENT

The attorneys participating in this deposition acknowledge that the reporter is not physically present in the deposition room and that he/she will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the reporter will administer the oath remotely, pursuant to Executive Order Number 202.7, issued by New York State Governor Andrew M. Cuomo on March 19, 2020. All parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Page 11

221.  UNIFORM RULES FOR DEPOSITIONS

221.1 Objections at Depositions:

(a) Objections in general:  No objections shall be made at a deposition except those which, pursuant to subdivision (b), (c) or (d) of Rule 3115 of the Civil Practice Law and Rules, would be waived if not interposed, and except in compliance with subdivision (e) of such rule.  All objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the CPLR.

b) Speaking objections restricted:  Every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis of error or irregularity.  Except to the extent permitted by CPLR Rule 3115 or by this rule, during the course of the examination, persons in attendance shall not make statements or comments that interfere with the questioning.

Page 12

221.  UNIFORM RULES FOR DEPOSITIONS

221.2 Refusal to answer when objection is made

A deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of the court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person.  An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision.  Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement of the basis therefor.  If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

221.3 Communication with the deponent:  An attorney shall not interrupt the deposition for purposes of communicating with a deponent unless all parties consent or communication is made for the purpose of determining whether the question should not be answered on the grounds set forth in section 221.2 of these rules and, in such event, the reason for the communication shall be stated for the record



Page 13

221.  UNIFORM RULES FOR DEPOSITIONS succinctly and clearly.

IT IS FURTHER STIPULATED AND AGREED that the transcript may be signed before any Notary Public with the same force and effect as if signed before a clerk or a judge of the court.

IT IS FURTHER STIPULATED AND AGREED that the examination before trial may be utilized for all purposes as provided by the CPLR.

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the CPLR cannot be deemed waived, and the appropriate sections of the CPLR shall be controlling with respect hereto.

IT IS FURTHER STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that each attorney will pay for their own copy of the non-party witness' deposition transcript of these proceedings.

*  *  *  *  *  *

Page 14

DOVID KLEINER                THURSDAY, JUNE 18, 2026

THIS IS THE REMOTE ZOOM DEPOSITION OF:

DOVID KLEINER

appearing on behalf of the DEFENDANT, 1915 REALTY LLC herein, Re:  DAMIAN BATISTA AND SANDRA BATISTA v. EDELMAN SCHWARTZ PLLC, ZEV SCHWARTZ, 1915 REALTY LLC, BINOYMIN HERZL, AND YONAH ROTH, said Witness produced pursuant to ORDER, on THURSDAY, JUNE 18, 2026, before MICHELLE TROY PARRISH, Court Reporter and Notary Public in and for the State of New York

*  *  *  *  *  *

THE REPORTER: Please raise your right hand.

THE WITNESS: (Witness complies.)

THE REPORTER: Do you swear or affirm that the testimony you will be giving today will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I affirm to tell the truth and nothing but the truth.

THE REPORTER: Please state your name for the record.

Page 15

DOVID KLEINER            THURSDAY, JUNE 18, 2026

THE WITNESS: Dovid Kleiner.

D-O-V-I-D, K-L-E-I-N-E-R.

THE REPORTER: Please state your address for the record.

THE WITNESS: 141 Seventh Avenue, JP, Brooklyn New York 11230.

*  *  *  *  *  *  *

DOVID KLEINER

called as the witness, hereinbefore named, being first duly cautioned and sworn or affirmed by MICHELLE TROY PARRISH, Court Reporter and Notary Public in and for the State of New York, to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. KESHAVARZ

Q.  The name you just gave to the court reporter, is that your full legal name?

A.  Dovid Kleiner.  I can give you the middle initial.  Y-I-T-Z-C-H-O-K.

Q.  Can you spell that a little slower?

A.  Y-I-T-Z-C-H-O-K.

Page 16

DOVID KLEINER            THURSDAY, JUNE 18, 2026

Q.  Okay.

And you understand from the court reporter that you are obligated to tell the truth subject to the penalty of perjury?

Do you understand that?

A.  Sure do.

Q.  Okay.

And the deposition was set to start at 10:00, but you had been on an iPad in the car until just a few minutes ago, is that right?

A.  That is true.

Q.  Now, have you ever used any other name than --

Do you pronounce it Dovid or David?

A.  Legally it's Dovid.  People call me David.

Q.  Other than David Kleiner, have you ever used any other name?

A.  I have used David Green.

Q.  Have you used any other name other than David Green?

A.  Not that I recall.



Page 17

DOVID KLEINER                THURSDAY, JUNE 18, 2026

Q.   If you used a name to sign government documents, you would remember that, right?

A.   I sign them DK.

Q.   Other than DK and David Green, have you ever used any other name?

A.   Not that I recall.

Q.   If you signed a government document with another name, you would remember that, right?

A.   No.

Q.   It is possible you could have signed a government document under a penalty of law and you would have used a name not your own, that's a possibility?

A.   I mistakenly could have done that.

Q.   Never intentionally?

A.   No.

Q.   Have you ever done that mistakenly?

A.   Not that I know about.

Q.   Do you have a photo ID with you, please?

A.   Sure.

Q.   May I see it, please.

Page 18

DOVID KLEINER                THURSDAY, JUNE 18, 2026

* * * * * * * * *

(The Witness complied with counsel's request.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.   Do you have a driver's license?

A.   Sure.  Yeah.

* * * * * * * * *

(The Witness presented their driver license.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.   Let me ask you, what is your driver's license number?

A.   My driver's license number is Maryland ████████████.

Q.   Date of birth?

A.   ███████.

Q.   Social Security?

A.   ██████████.

Q.   The address you gave earlier, is that a home address?

A.   No.  Work address.

Q.   What is your home address?

Page 19

DOVID KLEINER                THURSDAY, JUNE 18, 2026

A.   On my driver's license?

Q.   What is your actual home address?

     MR. BERRY: Answer the question.

     THE WITNESS: Where do I sleep at night?

     MR. BERRY: Don't ask the question.

BY MR. KESHAVARZ

Q.   My question is:  What is your home address?

A.   I live at 1866 58th Street, Brooklyn, New York 11204.

Q.   When you say -- I never used the term before, but you raised it -- that's where you sleep at night, that's what you meant?

A.   Yes.

     MR. KESHAVARZ: Let me go over a few ground rules.

     It's important when I take your deposition to pause until I'm done with the question before you begin to answer it

Page 20

DOVID KLEINER                THURSDAY, JUNE 18, 2026

because the court reporter can only take notes down of one person at a time.  Will you please attempt to do that?

     THE WITNESS: I'll try to do that.

     MR. KESHAVARZ: Thank you.

     If I ask you a question and you don't understand it, will you please ask me to rephrase?

     THE WITNESS: I will try.

     MR. KESHAVARZ: And if you don't, if I ask you a question and you don't ask me to rephrase, it is reasonable to assume that you understood the question.

     THE WITNESS: Yes.

BY MR. KESHAVARZ

Q.   Your driver's license has what address for you?

A.   My Maryland address.

Q.   What is that?

A.   6014 Clover Road, Baltimore, Maryland 20115.



Page 21

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Is that your residential address?

A.  I don't know.

Q.  What about that question do you not understand?

A.  That's where I grew up.

Q.  Is that your residential address?

A.  No.

Q.  When you file personal taxes, what address do you use?

A.  I don't know.

Q.  When you ever filed a government document, what do you put down as your home address?

A.  My bookkeeper does it.

Q.  When you file a government document, when you sign a government document, when you fill out a government document, what address do you use?

A.  I don't know.

Q.  Well, what addresses could you use?

A.  I could use 1866 58th Street.  I could use -- I have many addresses. I used to live at 1845 58h Street. Clover Road in Baltimore, Maryland.

Page 22

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Why do you have a Maryland driver's license if you live in New York?

A.  Go back and forth.

Q.  Your place of residence is in New York?

A.  Yes.

Q.  I'm sorry?

A.  I don't know how to respond to that.

Q.  Are you taking any medications that may affect your ability to understand and answer my questions?

A.  I don't think so.

Q.  Are you under the influence of any chemicals, alcohol, drugs or anything else that might affect your ability to understand and answer my questions?

A.  No.

Q.  You said you use your name when you fill out government documents?

A.  I didn't say that.

Q.  When you fill out government documents, have you ever used a name other than David Kleiner?

Page 23

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  It's possible that I used the name David Green.

Q.  Any other names?

A.  I said I don't recall.

Q.  I see.  Why do you use the name David Green when you sign government documents?

A.  I didn't say I did.  It's possible.

Q.  When you sign certain government documents, you swear under oath that it's true, right?

A.  I don't know what you are referring to.

Q.  How is it possible that you could sign a government and document and use the name David Green?

MR. BERRY: Objection to form.

You have to give me a chance to object.

Mr. Keshavarz, give him a chance to finish the question. Give me a chance to object. Listen to my instructions.

Page 24

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  I don't recall the question so let me ask it before I forget. Why would you ever sign a government document under oath and it being possible you used a name other than your real name?

MR. BERRY: Objection to form.

Go ahead and answer the question.

THE WITNESS: I used to go by the name of David Green so people don't know where I lived.  I don't have to.

Some people that were not very healthy in the Bronx, so I didn't need them looking up my address, so I went by the name David Green.

BY MR. KESHAVARZ

Q.  Any other reason?

A.  No.

Q.  Why wouldn't you put that name on

ESQUIRE
DEPOSITION SOLUTIONS

DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
25–28

Page 25

DOVID KLEINER          THURSDAY, JUNE 18, 2026

your government document?

MR. BERRY: Presumes facts not in evidence.

MR. KESHAVARZ: Go ahead. You can answer.

THE WITNESS: Same reason. Any documents that could go, I don't need them knocking on my door and making noise at my house.

BY MR. KESHAVARZ

Q. Any other reason?

A. No.

Q. Where do you use a name other than your legal name?

A. In the Bronx, with tenants.

Q. And leases?

A. It's usually under the building name.

Q. I'm trying to figure out what documents you use an alias.

A. Honestly don't know.

Q. All right. I believe you indicated when we were off the record that you had your

Page 26

DOVID KLEINER          THURSDAY, JUNE 18, 2026

deposition taken before, is that right?

A. I have had depositions before, slip and falls.

Q. When you had your deposition taken, is that what you mean?

A. I had depositions before.

Q. What I'm trying to get at is not you just sat in on a deposition. My question is have you had your deposition taken before?

A. Yes.

Q. How many times have you had your deposition taken before approximately?

A. Ten times.

Q. Other than slip and fall cases, what other instances was your deposition taken?

MR. BERRY: Form. Go ahead and answer the question.

THE WITNESS: I honestly don't recall.

Page 27

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. Have you ever been sued before in something other than a slip and fall case?

A. I don't recall.

Q. Is it possible?

A. It is possible.

Q. You realize you are under oath. This is a transcript that goes in front of a Judge or a jury. You do understand that, right?

A. Yes, I understand that.

Q. Have you ever been sued related to a landlord-tenant matter other than slip and fall?

A. And the tenant, have I been sued? I had a super sue me. Now that you bring it up, I have had super sue me.

Q. What else?

A. I don't know. You want to help me out?

MR. BERRY: No commentary following your answer.

Page 28

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. Let me ask you another question. When you were sued by your super, is that for an allegation that you failed to properly pay them?

A. Yes.

Q. And --

A. It's a labor case.

Q. And did you pay out money for that?

A. Sure.

Q. How much?

A. It was different cases.

Q. How much in total, approximately?

A. $200,000.

Q. Other than being sued by any slip and fall cases and by supers for alleging nonpayment, have you been sued in any other matter?

A. I said I don't recall.

Q. What is your cell phone number, please?

A. 917-216-8527.

Q. Do you use any other phone numbers?

A. That's my main phone.



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
29–32

Page 29

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Do you have a virtual phone number, anything along those lines?

A.  Not that I used recently.

Q.  You used to have one?

A.  I don't know if they even worked.  I tried to set one up, but I don't know if it works.

Q.  Have you had any other cell phone numbers other than what you indicated?

A.  I had a super phone.  Sometimes I give it to the super, switch around with them, the phone breaks, come and go.

Q.  What other?

A.  917-642-9202.

Q.  What else?

A.  Phone number 347-680-258 that I use sometimes.

Q.  What else?

A.  That's it.

Q.  Those three phone numbers that you use, you said the second one you use for supers.  What did you mean by

Page 30

DOVID KLEINER          THURSDAY, JUNE 18, 2026

that?

A.  I give the super a phone, and when he doesn't work for me, I take it away.  It's a temporary phone.

Q.  And those numbers all ring under the same physical phone?

A.  I can't hear you.

Q.  Do those numbers all ring on the same physical phone?

A.  No.

Q.  So, for what purpose do you use the third number for?  You said you use three numbers.

A.  My son actually has the phone right now.  It's an extra phone.

Q.  Okay.

I just want to try to minimize the apps you can put on it.

A.  It's a flip phone.

Q.  What do you understand about what this lawsuit is about?

MR. BERRY: Form.

THE WITNESS: What is the question?

Page 31

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  What is your understanding about what this lawsuit is about?

A.  Asking that I sued a tenant for money that she didn't owe, as far as I understand it.

Q.  Do you have any other understanding other than that?

A.  No.

Q.  And when you sued the tenant, they, in fact, did not owe the money, correct?

MR. BERRY: Objection to form.

THE WITNESS: I'm not sure about that.

BY MR. KESHAVARZ

Q.  You signed a stipulation in the case that any rental arrears were satisfied, is that right?

MR. BERRY: Form. Go ahead.

THE WITNESS: I don't recall what I signed.

Page 32

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  Okay.

Well, you wouldn't sign or authorize to be signed a stipulation that wasn't true, right?

MR. BERRY: Form. Go ahead.

THE WITNESS: I don't know, honestly.

BY MR. KESHAVARZ

Q.  You can sign a stipulation that's not true?

A.  Not intentionally.

Q.  You wouldn't authorize your attorney to sign a stipulation that wasn't true, right?

MR. BERRY: Form.

Mr. Keshavarz, I'm a little concerned about your --

You want me to do this off the record with you?

MR. KESHAVARZ: Yes, let's go off the record outside of the presence of the witness.



Page 33

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Why don't you give me a call?

MR. BERRY: Why don't we just mute ourselves and I will call you.

MR. KESHAVARZ: Thank you.

* * * * * * * * *

(Break taken by all in attendance, after which time the deposition continued)

* * * * * * * * *

MR. KESHAVARZ: Back on the record.

BY MR. KESHAVARZ

Q.  So, I see you have papers in front of you and you are looking down.  Are you reviewing any papers during the course of your deposition?

A.  I'm reviewing the arrears and reports.

Q.  Arrears and reports of what?

A.  The different properties.

Q.  Any properties related to this case?

A.  No.

Page 34

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Any reason why you are doing that during the deposition?

A.  You went off the record.

Q.  Since 2021, what businesses do you own or control?

A.  What does this have to do with this case?

MR. BERRY: He is allowed to ask the question.  We do not have a relevance objection under the rules governing depositions in federal court.

Just answer the question.

THE WITNESS: I went into the nursing home business a little bit.

BY MR. KESHAVARZ

Q.  So, let me make sure the record is clear.

Since 2021, what businesses do you have ownership interest in or that you control?

MR. BERRY: Can we do it one at a time?  It's a very broad

Page 35

DOVID KLEINER          THURSDAY, JUNE 18, 2026

question.

MR. KESHAVARZ: Let me rephrase.

BY MR. KESHAVARZ

Q.  Since 2021 that businesses do you control?

A.  I don't control the nursing home business at all.

Q.  Put aside the nursing home business for a moment.  Since 2021 what businesses do you control?

A.  Only business I control is the managing business that I do.

Q.  Through what companies do you do the managing business since 2021?

A.  DKCK Management.

Q.  Anything else?

A.  Not that I recall.

Q.  Are you a managing agent of any corporation or business since 2021?

MR. BERRY: Objection.

Can you rephrase that?

BY MR. KESHAVARZ

Q.  What is your role at DKCK?

Page 36

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  I run a management business.

Q.  You are the person who makes the decisions for the business?

A.  Yes.

Q.  You are the person who controls the business?

A.  I don't know if you call that control.

Q.  Well.  All right.

DKCK is the -- et me get my terminology here -- is the managing agent for certain properties, correct?

A.  Correct.

Q.  What are your responsibilities?  I think you answered this question, so I apologize if I'm repeating myself.  You run DKCK, is that accurate?

A.  I don't know what you consider when you say running DKCK.

Q.  You are the managing agent for DKCK, right?

A.  DKCK Management, I don't know what -- it's a corporation.  I don't know



Page 37

DOVID KLEINER          THURSDAY, JUNE 18, 2026

what you mean by running it.  It doesn't own any buildings, DKCK.

Q.  It manages those buildings?

A.  Correct.  Manages.

Q.  As the managing agent for those buildings --

A.  Yes.

Q.  -- and those buildings are under different corporate names?

A.  Correct.

Q.  The corporations are all owners of properties?

A.  Rephrase that, please.

Q.  The corporation that DKCK is the managing agent for, are those owners of properties?

A.  Yes.

Q.  Are they anything else?

A.  I don't know.  Basically properties and LLC's are properties.

Q.  And since 2021 approximately how many properties?

A.  I can't tell you that.

Q.  Well, does each property have its own

Page 38

DOVID KLEINER          THURSDAY, JUNE 18, 2026

LLC?

A.  Yeah.

Q.  And you at DKCK, you are the one that makes the decision about whether a rental arrears case should be filed for those buildings, correct?

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  And 1915 Realty is one of those corporations, correct?

A.  Correct.

MR. BERRY: Form.

David, give me a chance to object.  1915 to the petition is an LLC.

MR. KESHAVARZ: Fair enough.

BY MR. KESHAVARZ

Q.  Can you give me a ballpark idea about how many units that you do property management for?

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  Roughly.

A.  Approximately 1,500 units.

Page 39

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  And when you make the decision to file a nonpayment petition for those 1,500 units, approximately, are there ballpark -- are they, like, ten corporations that own the properties, 100?  Can you give me a ballpark?

MR. BERRY: Form.

THE WITNESS: Can you rephrase that, please.

MR. BERRY: Thank you.

MR. KESHAVARZ: Sure.

BY MR. KESHAVARZ

Q.  You said 1,500 units that you do the property management for, correct?

A.  Approximately, yes.

Q.  And those are property management that you do through DKCK, correct?

A.  Yes.

Q.  Do you do the property management through any other entity other than DKCK?

A.  Not that I recall.

Q.  Approximately how many buildings are there that you manage, just roughly

Page 40

DOVID KLEINER          THURSDAY, JUNE 18, 2026

speaking; 10, 100, 50?

MR. BERRY: When you say "you", you don't mean David individually without the installation of a corporate entity?

MR. KESHAVARZ: That is a good question.

MR. BERRY: Can we stipulate that "you" does not mean David, it means an LLC that he is affiliated with.

MR. KESHAVARZ: Let me clarify the question.

BY MR. KESHAVARZ

Q.  I believe you testified that as the managing agent at DKCK that you make the decisions about when to file nonpayment petition actions, correct?

A.  Correct.

Q.  And you make the decisions, generally speaking, about how those cases should proceed, is that correct?

A.  Yes.



Page 41

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  And you did that as to the Batistas, correct?

A.  Yes.

Q.  And you decide how much should be sued for, correct?

A.  Not exactly.  It usually all comes off the computer.

Q.  But you make the decision in general terms about what should be sued for in the down payment petitions for these 1,500 units, correct?

A.  Can you rephrase that, please?

MR. BERRY: Form.

Go ahead.

BY MR. KESHAVARZ

Q.  Okay.

Well, since you run the business of DKCK, would it be fair to say that when you decide to file suit for the 1,500 properties, you do so both personally and on behalf of DKCK?

Would that be an accurate statement?

A.  No.

Q.  In what way?

Page 42

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  This building is owned by a different entity.  I'm doing it on behalf of that entity.  I don't sue under DKCK.  It gets sued under 1915.  It gets sued under each individual building.

MR. KESHAVARZ: That's fair enough.

BY MR. KESHAVARZ

Q.  This is what I meant to ask, and thank you for clarifying this.  So, you make the decisions through DKCK about when to file suit for the 1,500 units for nonpayment conditions, correct?

A.  No.

Q.  What way is that incorrect?

A.  I'm suing for money that's owed to 1915.

Q.  Let me rephrase the question.

A.  You did that.

MR. BERRY: Once he says that, let him do it.

THE WITNESS: No problem.  He can do whatever he wants.

Page 43

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: No external commentary.  Just listen to the next question.

Answer the question.  No dialogue.

BY MR. KESHAVARZ

Q.  This is what I'm trying to get at.

You, personally, through DKCK, make the decisions about whether these different property ownership corporations file a nonpayment petition against the 1,500 tenants, is that true?

A.  No.  The computer does.

Q.  In what way?

A.  Bring up an outstanding balance report and see what is owed, and if I see something that's owed after let's say $5,000, I will start a nonpayment case.

Q.  You personally make those decisions on behalf of DKCK for those 1,500 units even though they go through different corporations, is that

Page 44

DOVID KLEINER          THURSDAY, JUNE 18, 2026

accurate?

A.  You didn't listen to what I said.

Q.  Can you please clarify?

A.  I said I bring it up on the computer, whatever it says on the computer, when I bring up an outstanding balance report for 1915, for example, somebody owes $5,000 and I go through it and based on the balance on the computer I will start a nonpayment case.

Q.  You would make those decisions?

A.  Correct.

Q.  Personally you would make those decisions?

A.  Yes.

MR. BERRY: Objection.

Please.  I'm confused.

MR. KESHAVARZ: You can object as to form.

MR. BERRY: I'm objecting as to form.

You want me to call you again?



DOVID KLEINER                                                    June 18, 2026
BATISTA vs EDELMAN SCHWARTZ PLLC                                      45–48

Page 45

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. KESHAVARZ: Why don't you give me a quick call.

* * * * * * * * *

(Break taken by all in attendance, after which time the deposition continued)

* * * * * * * * *

MR. KESHAVARZ: Let's go back on the record.

BY MR. KESHAVARZ

Q.   What steps did you take to prepare for your deposition today?

A.   Nothing really.

Q.   Did you see a document called a Notice of Deposition?

A.   No.

Q.   Did you know that you were supposed to prepare to testify as to certain topics?  Were you aware of that?  My question is did you know that there were certain specific topics that you were supposed to gather information for to be able to answer?  Did you know that?

Page 46

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.   No.

Q.   After you got a copy of the lawsuit, is there any particular act that you did in response to the lawsuit?

A.   I hired a lawyer.

Q.   Anything else?

A.   No.

Q.   Did you sell any properties because of the FD CPA lawsuit?

A.   No.

Q.   Did you file anything on ACRIS because of this lawsuit?

A.   Absolutely not.

Q.   Anything that's filed on ACRIS for the properties that DKCK manages is a decision that you make personally, right?

A.   Rephrase, please.

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.   Before I get to that, I don't know if I nailed down this question or not, so I apologize for asking it again.  For the 1,500 unit that DKCK manages

Page 47

DOVID KLEINER          THURSDAY, JUNE 18, 2026

for the different corporations that own each building, can you give me a ballpark idea about how many corporations there are; five, 100, 10?  Can you give me a rough idea?

A.   Between 25 and 75.

MR. BERRY: I want to go off the record and speak to my client.

MR. KESHAVARZ: I don't think you can go to off the record to speak to your attorney.

MR. BERRY: I will just call him on the cell phone.  Why don't you finish this line of questioning, then we'll take a short break.

MR. KESHAVARZ: Okay.  Fair enough.

BY MR. KESHAVARZ

Q.   What are the largest properties, the main properties that you do property management services for DKCK?  What are the largest ones?

Page 48

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.   Between 30 and 100 units, basically.

Q.   I'm going to ask the court reporter to leave a blank here, and if you could check to see what corporations those were between 2021 and now, I would ask you to fill that in or provide a document that shows that.  Is that okay?

A.   You want new buildings I got?

Q.   The buildings from 2021 to present.

A.   You are not being clear.  Anything I acquired from 2021 to 2026?

MR. BERRY: I'm speaking, David.  Mr. Keshavarz, can you just read into the record the question that you want answered before we fill in the blank?

MR. KESHAVARZ: Okay.  I want to know what properties or corporations that DKCK has managed from 2021 to present and then which ones they



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
49–52

Page 49

DOVID KLEINER          THURSDAY, JUNE 18, 2026

currently manage.

MR. BERRY: We'll leave a blank in the record.  We'll take it under advisement.

When we get the transcript, we'll respond with the information or an objection.

Okay.

MR. KESHAVARZ: Thank you.

**INFORMATION INSERT**

(INSERT)_____

_____

_____

* * * * * * * * *

BY MR. KESHAVARZ

Q.  Did you review any documents in preparation for your deposition today, sir?

A.  No.

Q.  Did you go to college?

A.  No.  Actually, I'm sorry, I apologize.  I went to one semester.

Q.  What school?

A.  Touro I think it was.

Page 50

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  About how long?

A.  Twenty years ago.

Q.  Any other training or education other than college that you received since then?

A.  No.

Q.  Do you have any certifications?

MR. BERRY: That is a very broad question.

What do you mean by "certifications"?

MR. KESHAVARZ: In relation to property management.  In relation to landlord-tenant and managing property.

BY MR. KESHAVARZ

Q.  Are you a licensed real estate agent?

A.  No.

Q.  Other than a driver's license, do you have any other licenses?

A.  Marriage license.

Q.  Congratulations.  Any other license?

A.  No.

Q.  I'm trying to figure any other

Page 51

DOVID KLEINER          THURSDAY, JUNE 18, 2026

business license.

How many people work at the DKCK?

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  Approximately.

A.  Approximately ten people.

Q.  And who are those people?

A.  Office staff.  Managers.

Q.  Is that the nature of all the employees, staff managers?

A.  Yes.

Q.  What does your staff do in particular?

A.  Field managers.  There are secretaries that answer the phones.  Secretary that pays the bills.  Secretary that pays the rents.  Everyone has different job capacities.

Q.  Just quickly, who are the ten people that work for DKCK?  What are their names?

THE WITNESS: I don't see the relevance here.

Page 52

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: He is entitled to know the answer to this question.

THE WITNESS: There is different guys and every one has their own job what they have to do.

BY MR. KESHAVARZ

Q.  All right.

Who is Victor Espinosa?

A.  Who?

Q.  Do you know anyone named Victor Espinosa?

A.  He takes care of answering phones and helping tenants out with complaints.

Q.  What does My Rental Property LLC do?

A.  Victor works for My Rental Property.  It's not my company.  It's the person who brings the certificates.

Q.  What do you mean, the person who brings the certificates?

A.  We have overseas secretaries that answer phones and help out tenants, and it's a business that they bring people, workers for me.



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
53–56

Page 53

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  And those workers, do they work in the DKCK office?

A.  I don't hear you.

Q.  The workers that My Rental Property brings to work, do those people work at the DKCK office?

A.  No, overseas.  Virtual assistants.

Q.  I see.  All right.
    What is Phelan Place Holdings, LLC?

A.  It's a new corporation that we opened.  Actually, a while ago, after we had our building collapse, we opened our corporation because we were not happy with the media.  We were not happy with what was going on under 1915 Realty, so we opened the same LLC with the name members.

Q.  Who are the members?

A.  Andrew Issac Family Trust, Robert Neiss, Mannandel Klein, and I think it's Jacob Dekellebaum also (All Phonetic Spellings subject to correction).

Q.  And do each of those corporations

Page 54

DOVID KLEINER          THURSDAY, JUNE 18, 2026

that owned the different properties, do they generally have the same owners?

A.  No.

Q.  Do they?

A.  No.

Q.  Do they vary significantly?

A.  Yeah.

Q.  In what way?

A.  Certain members are not owners in many buildings.  Some are here, but not other places.

Q.  But do any of those individuals who -- the owners for any of the buildings, do they run the buildings?  Do they control the operations of those buildings?

A.  No.

Q.  They are just investors?

A.  Correct.

Q.  Do you know why some of them might be listed as a managing agent on some of the court papers?

A.  Managing agent, or member?

Page 55

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Do you know why any of those individuals might be listed on any of the nonpayment petitions that DKCK files on behalf of the LLC's?

A.  Something that have different partners that they step up to the plate.  I shouldn't have all the responsibilities.  They should feel responsible too.

Q.  What do you mean they should feel responsible too?

A.  If there is an issue that comes up, they should know about it and I should be able to ask them about something.

Q.  Can you give me an example?

A.  The capital call.  Need to do roof work.  They are an agent.  They will feel their name is somewhere that they will have to cough up money if there is money needed.

Q.  Any other companies that come to mind?

A.  No.

Page 56

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Who is Ms. G?

A.  Ms. G is a secretary.

Q.  Do you know what her full name is?

A.  Zissy Gliberman.

Q.  And what is her basic role in the office?

A.  Secretary.

Q.  Does she communicate with the lawyers for the nonpayment petitions that DKCK files on behalf of the different LLC's?

A.  The lawyers could send an e-mail.  She could respond.

Q.  Is she the main point of contact for DKCK?

A.  Victor is contact also.

Q.  Is a what?

A.  Victor Espinosa also.  He is involved in this also.

Q.  And the nonpayment petitions, are you generally involved in those?

A.  Yes, I am usually involved.

Q.  You are usually copied on the e-mails for those cases?



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
57–60

Page 57

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  No.

Q.  In terms of anything that materially happens?

A.  Something it gets sent to me, they will e-mail.  If I don't respond, they will call me.

Q.  If they need someone to make a decision about how to proceed with a case, they would reach out to you?

A.  They will call me, yes.

Q.  Because you are the person who makes the decisions about how these nonpayment petitions work?

A.  Most of the time, yes.

Q.  That's true for the nonpayment petition as to the Batistas correct?

A.  Yes.

Q.  Do you remember anything from your own memory about what happened with the nonpayment petition with the Batistas?

A.  Definitely not.

Q.  Did you review any documents related to the Batistas case?

Page 58

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  No.

Q.  I'm just looking through a chain of e-mails, and we'll go through them in a minute.  Do you know someone named Fay?

A.  She used to be a secretary.

Q.  Do you know what her general role was?

A.  Secretary also.

Q.  Do you know who Sol is?

A.  Sol takes care of repairs.

Q.  What is Sol's last name?

A.  Seldman.

Q.  Leah, do you know who that person is?

A.  She used to work for me.  She's no longer with me.

Q.  Who is Josh Pamrance (Phonetic Spelling)?

A.  Managing.  Co-manager.  Field manager.

Q.  Is that the field manager for the building that the Batistas live in?

A.  He has been there.  Have a few guys who go there.  I have another one guy

Page 59

DOVID KLEINER          THURSDAY, JUNE 18, 2026

who goes there.

Q.  And there is someone named JS in the e-mails.  Do you know who that is?

A.  Jason Singer.  I said his name.

Q.  He works for you at DKCK?

A.  Correct.

Q.  What are his main responsibilities?

A.  He is also field manager.

Q.  And for the building that the Batistas live in, what does that entail, basically?

A.  Going through the building, make sure the building is clean, make sure the repairs are done, any lease issues.

Q.  Let's talk about the 1915 building.  Who were the owners of that company?

A.  The same as 1915 Realty.  The same as fee-ing place.  That's contact.  Nothing changed.

Q.  When you filed a lawsuit against the Batistas, Phelan Place Holdings actually owned the building, right?

A.  I don't know exactly the dates I opened the corporations.  We opened

Page 60

DOVID KLEINER          THURSDAY, JUNE 18, 2026

the corporation after the collapse.  I don't know when the lawsuit was.

Q.  1915 Realty LLC, did that shut down?

A.  No.

Q.  Is it still doing anything?

A.  I never shut it down.  I needed bank approval to switch the corporations, and it took a very long time, so that's why it wasn't filed right away.  Default in the mortgage if you change it without permission, so it took a very long time to do.

Q.  Well, I will represent to you that the lawsuit by 1915 against our client was filed during a time period where it fell in place with the owner.  Do you know why that would be?

A.  When was the lawsuit started?

Q.  March 31, 2025.

A.  Okay.  But we didn't have bank approval yet.

Q.  But, the actual ownership of the building had changed from 1915 Realty



Page 61

DOVID KLEINER            THURSDAY, JUNE 18, 2026

to Phelan.  Where did the money for rent for the building go to after Phelan had purchased the building?

A.  There is was no transfer.  There was no money transfer.  It's still going to 1915.

Q.  So, the building is being run as a practical matter through 1915 Realty?

A.  Correct.

Q.  As a practical matter, the building is being run through the 1915 Realty entity, even after the sale of the building to Phelan, is that right?

A.  Correct.

MR. BERRY: Give me a chance to object.

I would like to have asserted a form objection.

THE WITNESS: I'm sorry.

BY MR. KESHAVARZ

Q.  The rent payments that are made for the building where my clients reside, where does that money go?  Does it go to DKCK?  Does it go to one of the

Page 62

DOVID KLEINER            THURSDAY, JUNE 18, 2026

other corporations, or where does it go?

A.  1915 Realty LLC.

Q.  They have a bank account where the money goes into?

A.  Correct.

Q.  And Phelan doesn't have a bank account that the money goes into?

A.  I can't hear you.

Q.  There is no bank account that Phelan, the money related to the building goes into?

A.  It still goes into 1915 Realty, but there is an account for Phelan.

Q.  But the money didn't go through that account for the building, does it?

A.  Money comes in, goes into 1915.  This is where it goes into.

Q.  Okay.

So, does My Rental Property do the repairs for the building that my clients reside in?

A.  No.

Q.  I'm sorry if I asked this before.

Page 63

DOVID KLEINER            THURSDAY, JUNE 18, 2026

What does My Rental Property do?

A.  They get employees.

Q.  That work virtually for you?

A.  Correct.

Q.  But they work for DKCK, even though they get the employees through My Rental Property, is that right?

A.  Yes.

Q.  So payment to those employees come from DKCK, is that right?

A.  Correct.

Q.  Let's go back to David Green.  You say that he does or doesn't sign government documents?

A.  I don't know.

Q.  But David Green is you?

A.  Yeah.  He is a/k/a.

Q.  And when you use the name David Green, you don't say David Green a/k/a David Kleiner, right, you just say David Green?

A.  It depends.

Q.  If you use an alias, it kind of defeats the purpose of an alias if

Page 64

DOVID KLEINER            THURSDAY, JUNE 18, 2026

you use your actual name?

A.  Last few years I use my name David Kleiner.

Q.  And before that you used?

A.  David Green.

MR. KESHAVARZ: Let's mark this as Exhibit A.

* * * * * * *

(Plaintiff's Exhibit A, Housing Assistance Payments Contract, consisting of 2 pages Bates stamped 1915_000015 to 16, is marked for identification.)

* * * * * * * * *

MR. BERRY: Let's take a five-minute break and come back and try to be more organized.

So back on at 10:47 or something like that.  Thanks.

* * * * * * * * *

(Break taken by all in attendance, after which time the deposition continued)

* * * * * * * * *



DOVID KLEINER                                            June 18, 2026
BATISTA vs EDELMAN SCHWARTZ PLLC                          65–68

Page 65

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. KESHAVARZ: Let's go back on the record.

* * * * * * * * *

(At which time, Plaintiff's Exhibit A was shown to the witness.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.  Can you identify what this document is, Bates stamp number 15 through 16?

A   (No verbal/audible response from Witness to question posed by Counsel.)

Q.  Can you identify what this is?

A.  Can you maximize the document?

* * * * * * *

(Counsel scrolled to adjust the exhibit as requested.)

* * * * * * *

BY MR. KESHAVARZ

Q.  Is this the HAP contract?

MR. BERRY: Form. Go ahead.

THE WITNESS: That's what it says.

Page 66

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  Is that what it is?

A.  That's what it says.

Q.  Is that what it is?

MR. BERRY: Form.

THE WITNESS: It says HAP contract.  You know as good as I know.  Housing Assistance Payment contract.

BY MR. KESHAVARZ

Q.  What is a HAP contract?

A.  I don't know.  You tell me.

Q.  You don't know?  You don't know what a HAP contract is?

A.  Housing Assistance Payments contract.

Q.  Do you know what that is?

MR. BERRY: Form.

THE WITNESS: It says United States Department of Housing and Urban Development, voucher number 430, expired 2018.

BY MR. KESHAVARZ

Q.  Have you ever heard of a HAP contract before?

Page 67

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: Form.

THE WITNESS: Yes.

BY MR. KESHAVARZ

Q.  What context have you heard of a HAP contract?

MR. BERRY: Form.

THE WITNESS: Section 8 tenants have HAP contracts.

BY MR. KESHAVARZ

Q.  Why?

A.  No idea.

Q.  What is the Section 8 program?

A.  Program that helps tenants with rent, I assume.

Q.  So you do property management through DKCK for about 1,500 units, is that right?

A.  Correct.

Q.  And many of those units are for tenants on Section 8?

A.  Who says?

MR. BERRY: Form. David, don't ask him questions.  If you can answer

Page 68

DOVID KLEINER          THURSDAY, JUNE 18, 2026

the question, answer the question.  If you can't, explain why you can't.

THE WITNESS: Okay.

BY MR. KESHAVARZ

Q.  Are some of the tenants at the 1,500 units Section 8 tenants?

A.  Yes.

Q.  Are many of the tenants Section 8 tenants?

MR. BERRY: Form.

THE WITNESS: No.

BY MR. KESHAVARZ

Q.  How many years have you been doing property management?

A.  Twenty-eight years.

Q.  One of your main roles is to file and control litigation on behalf of the various entities that own the buildings, right?

MR. BERRY: Form. Can you please ask the question in a non-leading fashion?



Page 69

DOVID KLEINER        THURSDAY, JUNE 18, 2026

MR. KESHAVARZ: You can answer.

THE WITNESS: Rephrase, please.

BY MR. KESHAVARZ

Q.  As the person --

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  You have been doing property management for 28 years, right?

A.  I think so.

Q.  All right.

And you work for 1,500 units approximately, right?

A.  Yes.

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  So you know everything there is about property management?

A.  No.

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  You are a professional.  You know when you can't file a nonpayment

Page 70

DOVID KLEINER        THURSDAY, JUNE 18, 2026

petition against a tenant, right?

MR. BERRY: Form.

THE WITNESS: I don't know.

BY MR. KESHAVARZ

Q.  So, you direct the law firms for various LLC's that own the properties to file a lawsuit?

MR. BERRY: Form.

MR. REYNARD: Objection.

BY MR. KESHAVARZ

Q.  What is Section 8?

A.  It's a program that helps tenants pay for rent.

Q.  What do you do differently, if anything, when you direct the law firm to file?  Let me just be clear so I don't have to say this over and over again.  When you direct a law firm to file an action, those are through the various LLC's that own the property, not in the name of DKCK, is that right?

MR. BERRY: Form.

THE WITNESS: They sue it on

Page 71

DOVID KLEINER        THURSDAY, JUNE 18, 2026

each individual.

BY MR. KESHAVARZ

Q.  So, when I say that DKCK forwards an account to be sued, I do not mean it under DKCK's name, I just mean it under the various LLC's that own the building, okay.  So you understand me to mean that?

A.  No.

Q.  What about that don't you understand?

A.  I don't have clarity.  I have to digest it.

Q.  All right.

The owners of the 25 to 57 LLC's for the 1,500 properties that you manage, each one of those LLC's owns a different building, correct?

A.  Correct.

Q.  And when you direct a law firm to file a lawsuit for nonpayment of rental arrears through DKCK, you do that to be filed under the name of the various LLC's, correct?

A.  Sounds good.

Page 72

DOVID KLEINER        THURSDAY, JUNE 18, 2026

MR. BERRY: Form.

Go ahead.

BY MR. KESHAVARZ

Q.  Is that correct or is that not correct?

A.  Sounds good.

Q.  Is it true or not true?

MR. BERRY: Just can you -- the reporter read the question back slowly.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: And when you direct a law firm to file a lawsuit for nonpayment of rental arrears through DKCK, you do that to be filed under the name of the various LLC's, correct?)

* * * * * * * * *

MR. BERRY: Form.

Answer the question if you can.

THE WITNESS: We file it



Page 73

DOVID KLEINER        THURSDAY, JUNE 18, 2026

under each LLC separately.

BY MR. KESHAVARZ

Q.  So, the answer to my question is yes, correct?

MR. BERRY: Don't argue with the witness if you can avoid it. If you want to ask another one, go ahead.

MR. KESHAVARZ: I don't think he did.

BY MR. KESHAVARZ

Q.  Is the answer yes to my question?

MR. BERRY: Ask the question again.

THE WITNESS: I'm not going to answer the question.  Sorry.

MR. BERRY: Let me be in charge of this deposition, okay. Client, remember.

If there is a different answer you want to give --

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION

Page 74

DOVID KLEINER        THURSDAY, JUNE 18, 2026

into the record: And when you direct a law firm to file a lawsuit for nonpayment of rental arrears through DKCK, you do that to be filed under the name of the various LLC's, correct?)

* * * * * * * * *

MR. BERRY: Form.

THE WITNESS: Yes.

BY MR. KESHAVARZ

Q.  And you direct the law firms that file the suit under the name of the LLC about the amount they should file the lawsuit for based on what your records show, right?

MR. BERRY: Form.

THE WITNESS: Based on what the computer balances.

BY MR. KESHAVARZ

Q.  Do you inform the lawyers what amount of those are the government's share of the Section 8 program as opposed to the tenant's share?

MR. BERRY: Form.

Page 75

DOVID KLEINER        THURSDAY, JUNE 18, 2026

THE WITNESS: I give them a tenant statement and let them figure it out.

BY MR. KESHAVARZ

Q.  What is a "tenant statement"?

A.  It's a ledger.

Q.  Do you tell the lawyers that you direct to file suits whether the tenant is on Section 8 or not?

A.  Rephrase, please.

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.  The lawyers that you direct to file suit on the name of the LLC's, do you inform them whether or not the tenants are on Section 8?

A.  It says on it which ones are Section 8.

Q.  So, the answer to my question is yes, is that right?

A.  On the ledger it says Section 8.

Q.  Other than Section 8 being on the ledger, do you inform the lawyers in any other way about whether the

Page 76

DOVID KLEINER        THURSDAY, JUNE 18, 2026

client -- the tenant is on Section 8 or how much the tenant's share is, other than giving them the letter?

A.  You are adding things into the statement that wasn't previously said.

MR. BERRY: Objection.  Form. Can the court reporter please reread the question?

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: Other than Section 8 being on the ledger, do you inform the lawyers in any other way about whether the client -- the tenant is on Section 8 or how much the tenant's share is, other than giving them the letter?)

* * * * * * * * *

THE WITNESS: I give them the ledger.  That's where I'm ending.

BY MR. KESHAVARZ

Q.  Let me break that question down.



Page 77

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Other than giving the ledger, do you inform the attorneys in any other way that the tenant is on Section 8?

A.   I don't think so.

Q.   Do you tell the lawyer how much of the contract rent is the tenant's share?

A.   No.

Q.   So, the tenant is on Section 8, you just tell the lawyer the total amount that's owed per the lease, is that correct?

MR. BERRY: Form.

Give me a chance to object here.

THE WITNESS: Give them the tenant statement and they give it out.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: So, the tenant is on Section 8, you just tell the lawyer the total amount that's owed

Page 78

DOVID KLEINER          THURSDAY, JUNE 18, 2026

per the lease, is that correct?)

* * * * * * * * *

THE WITNESS: According to the ledger.

BY MR. KESHAVARZ

Q.   Do you sign contracts regarding your tenants' involvement in the Section 8 program?

A.   Yes.

Q.   When you sign those contracts, you are understanding what the contracts mean, right?

A.   No.

Q.   You sign contracts and you don't know what the contracts mean?

A.   Sometimes.

Q.   For HAP contracts, do you sign HAP contracts without knowing what a HAP contract is?

A.   Yes.

Q.   Why do you do that?

A.   It's the cost of doing business.  I do what I got to do.

Q.   You sign contracts with the

Page 79

DOVID KLEINER          THURSDAY, JUNE 18, 2026

government regarding Section 8 programs for your tenants, right?

A.   I don't know if you call it the government.  I sign with the tenants. I'm renting the apartment to the tenant, not to Section 8.

Q.   Do you ever sign documents with the government related to the Section 8 program for your tenants?

A.   I have signed documents, whatever they represent, that the tenant requests me to sign.

Q.   So, if the tenant doesn't request you to sign a document with the government agency regarding the Section 8 program for those tenants, you only sign those if the tenant asks you to, right?

MR. BERRY: Form.

MR. KESHAVARZ: You can answer.

THE WITNESS: I guess, from tenants I get what comes in the mail.  I don't know specifically

Page 80

DOVID KLEINER          THURSDAY, JUNE 18, 2026

what comes in, what goes out.

BY MR. KESHAVARZ

Q.   As the property management company, do you know what your role is in relation to payments received from the government for your tenants that are on Section 8?

MR. BERRY: Form.

THE WITNESS: Rephrase.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: As the property management company, do you know what your role is in relation to payments received from the government for your tenants that are on Section 8?)

* * * * * * * * *

THE WITNESS: No.

MR. KESHAVARZ: Let me just go to Exhibit A, the HAP contract.

BY MR. KESHAVARZ

Q.   This is the HAP contract for the



Page 81

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Batistas, correct?

A.  It says Damian Batista, 1957.

Q.  So the answer is yes?

A.  If that's what you are saying.

Q.  Do you understand what paragraph 7 means on Bates stamp 15?

A.  First time reading it.

Q.  Do you know what that means?

A.  No.

Q.  Is the ledger that you sent to the lawyers different for Section 8 tenants?

A.  No.

Q.  Let me clarify that. Is the ledger that you give to the attorneys to file suits in the name of the LLC, is the LLC different for Section 8 tenants as opposed to non-Section 8 tenants?

MR. BERRY: Form.

THE WITNESS: No.

BY MR. KESHAVARZ

Q.  Continuing to the second page of Exhibit A, Bates stamp number 16 from

Page 82

DOVID KLEINER          THURSDAY, JUNE 18, 2026

the document, your document production, is that your signature?

A.  Yes.

Q.  And you signed under the name of David Green, correct?

A.  Correct.

Q.  And you signed that you were the managing agent?

A.  Okay.

Q.  Is that correct?

A.  That's what it says.

Q.  And you signed that document on 6/16/2016, correct?

A.  Correct.  It says 6/16.  I don't know if it's true or not.

Q.  Is David Green, in fact, the managing agent for 1915 Realty LLC?

MR. BERRY: Form.

THE WITNESS: I don't know.

BY MR. KESHAVARZ

Q.  It's your signature, right?

A.  That's my signature.

Q.  You are the only managing agents for LLC's that DKCK does property

Page 83

DOVID KLEINER          THURSDAY, JUNE 18, 2026

management for, right?

A.  I didn't hear the question.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: You are the only managing agents for LLC's that DKCK does property management for, right?)

* * * * * * * * *

A.  I didn't hear you.

MR. BERRY: Form.

Go ahead.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: You are the only managing agents for LLC's that DKCK does property management for, right?)

* * * * * * * * *

MR. BERRY: Form.

THE WITNESS: No.

Page 84

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  In what ways is that not true?

A.  We went through this. There is other managing agents.

Q.  But they all go through DKCK Management, correct?

MR. BERRY: Form.

THE WITNESS: Possibly.

BY MR. KESHAVARZ

Q.  Well, you run DKCK, right?

A.  I try to.

Q.  So, you don't know -- I want to make sure you understood the question.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: But they all go through DKCK Management, correct?)

* * * * * * * * *

BY MR. KESHAVARZ

Q.  So, I just want to give you the opportunity to make sure your testimony is entirely truthful.



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
85–88

Page 85

DOVID KLEINER          THURSDAY, JUNE 18, 2026

DKCK, does the property management for all of the LLC's that it directs to file suits, right?

A.  I don't know.  I'm not sure.  I can't answer that.

Q.  What is DKCK's responsibilities for the properties it manages?

MR. BERRY: Form.

Go ahead.

THE WITNESS: I'm not sure.

BY MR. KESHAVARZ

Q.  But you run DKCK?

A.  I run DKCK.

Q.  But you don't know what your responsibilities are to the LLC's that you manage?

A.  No.  I try my best.

Q.  Do you know any of your responsibilities?

A.  Try to make the tenants happy and do the repairs.

Q.  Any other responsibilities that DKCK has for the LLC's that own the buildings?

Page 86

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  I'm not sure.

Q.  Who else would know at DKCK other than you?

A.  Nobody.

Q.  Who controls where the money goes from tenants who pay rent through those 1,500 units that you do property management for?

MR. BERRY: Form.

THE WITNESS: Goes into each account.  Each building has its own account.

BY MR. KESHAVARZ

Q.  DKCK manages all those funds, right?

A.  Each building is managed by its own LLC.

Q.  Right.

But DKCK does the management for the money that comes from the tenants for the 1,500 unit, right?

A.  That's what you are saying.

Q.  I'm asking you.

Is that a true statement?

A.  It wasn't a question.  You made a

Page 87

DOVID KLEINER          THURSDAY, JUNE 18, 2026

statement.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: But DKCK does the management for the money that comes from the tenants for the 1,500 unit, right?)

* * * * * * * * *

MR. KESHAVARZ: Let me re-ask the question.

BY MR. KESHAVARZ

Q.  For the 1,500 tenants for the properties that you manage, the checks get sent to DKCK, right?

A.  Yes.

Q.  And DKCK --

A.  They get sent to each corporation.

Q.  And those checks then go to DKCK, right?

A.  No.

Q.  Okay.

What addresses do those checks get sent to?

Page 88

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  P.O. box.

Q.  Same P.O. box that DKCK has?

A.  Each building has its own LLC.  Each one goes to the P.O. box.

Q.  And that P.O. box where the payments go is the Post Office box for DKCK, correct?

A.  I just said that.  No.  I get a lot of mail over there.  I get mail that's not ours too.

Q.  All right.

Well, what is your P.O. box for DKCK?

A.  P.O. box 248, Brooklyn, New York 11204.

Q.  And the rent for those 1,500 properties that you manage, those rent payments go to that P.O. box, correct?

A.  Correct.

Q.  And in what names do those checks generally get made out to for those 1,500 units that you do the property management for?

A.  Each LLC has a different name.



Page 89

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  And then DKCK?

A.  Then what?

Q.  Then DKCK decides what bank accounts those payments go to, right?

A.  No.

Q.  Who makes that decision?

A.  Whatever it says on the check, that's where it goes.

Q.  But you put it in the bank?  DKCK puts it in a specific bank account, right?

A.  Each check that's made out to the corporation is deposited with them.

Q.  DKCK decides which bank account it goes into, right?

MR. BERRY: Can we go off the record?

* * * * * * * * *

(At which time, a discussion was held off the record, after which time the deposition resumed.)

* * * * * * * * *

MR. KESHAVARZ: Let's go back on the record.

Page 90

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  What are your responsibilities as a property management company on behalf of Section 8 tenants?

A.  I have no idea.

Q.  You don't treat Section 8 tenants in terms of billing or accounting any differently than you treat any other tenant, right?

MR. BERRY: Form.

THE WITNESS: I'm not sure.

BY MR. KESHAVARZ

Q.  Do you seek to collect contract rent from tenants on Section 8 in the same way that were not on Section 8?

A.  You made a statement.  You know what you are doing.  I can't tell you what is right and wrong.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: Do you seek to collect contract rent from tenants on Section 8 in the same way that

Page 91

DOVID KLEINER          THURSDAY, JUNE 18, 2026

were not on Section 8?)

* * * * * * * * *

THE WITNESS: You made a statement.  That was a statement.

BY MR. KESHAVARZ

Q.  Is that correct?

MR. KESHAVARZ: Let me rephrase the question.

BY MR. KESHAVARZ

Q.  Do you through DKCK seek the full contract rent that is the full amount on the lease regardless if the tenant is on Section 8 or not?

MR. BERRY: Form.

THE WITNESS: That's my lawyer's decision, not mine.

BY MR. KESHAVARZ

Q.  Have you ever directed a lawyer to collect a full contract rent even if the tenant is on Section 8?

A.  I send the ledger, like I said previously.  I send the ledger and let the lawyer do his job.  Sorry.

Q.  So, for Mr. and Mrs. Batista, if the

Page 92

DOVID KLEINER          THURSDAY, JUNE 18, 2026

lawyer sued my client for the government's share of Section 8, that would be the lawyer's fault and not your fault, is that what you are saying?

A.  Correct.

MR. KESHAVARZ: I am showing you what will be marked as Exhibit B.
It's Bates stamped 1915-554, a single page, New York City Housing Authority Leased Housing Department Certification of Completed Repairs.

* * * * * * *

(Plaintiff's Exhibit B, New York City Housing Authority Leased Housing Department Certification of Completed Repairs, consisting of 1 page Bates stamped 1915_000554, is marked for identification.)

* * * * * * * * *
* * * * * * * * *



Page 93

DOVID KLEINER            THURSDAY, JUNE 18, 2026

(At which time, Plaintiff's Exhibit B was shown to the witness.)

* * * * * * * * *

THE WITNESS: It looks like it says Certification of Completed Repairs.

BY MR. KESHAVARZ

Q. Have you ever seen a document like this before?

A. No.

Q. What does it mean?

A. Means there were some repairs that were needed and it says what needed to be done; kitchen, wrong outlet installed, FGFCI needed.

Q. And you send this to the New York City Housing Authority, correct?

A. I sent it to where?

Q. New York City Housing Authority.

A. Yes, it gets mailed or e-mailed back to them.

Q. When you fill out this form, all the information is true and correct, right?

Page 94

DOVID KLEINER            THURSDAY, JUNE 18, 2026

A. To the best of my knowledge.

Q. Okay.
So, going to the bottom of this document, is that your signature under the name of David David?

A. Yes.

Q. And you are providing an owner certification to the government agency, correct?

A. I don't know who I'm sending it to, but it says David David.

Q. It says, Owner Certification.
So you are making a representation to the government that you are the owner, the management agent of the building, correct?

A. You made a statement.

Q. Is the answer to my question yes or no?

MR. BERRY: Form.
Go ahead.

THE WITNESS: It says David David. I signed it. Filled it out David David.

Page 95

DOVID KLEINER            THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. My question is that's your signature under the name David David, correct?

A. Yes.

Q. And it's dated 3/17/15, correct?

A. That's what it says on there.

Q. Why did you sign this document under the name David David and not under your own name?

A. I think that was asked I had a problem with David Green so I put David David. My name is David.

Q. What problem did you have with David Green?

A. I was told you are not supposed to do that anymore, so I changed.

Q. Not supposed to do what anymore?

A. You are not supposed to use an alias.

Q. Who told you that?

A. I was in court one time and they said you shouldn't be doing that.

Q. The Judge told you that?

A. Possibly.

Q. You think so?

Page 96

DOVID KLEINER            THURSDAY, JUNE 18, 2026

A. I think so.

Q. Okay.
What document did you use the name David Green for?

A. You had the same document before. It says David Green now it says David David.

Q. So, the document that you presented to the court, in the court hearing you talked about, that was a document that you signed and sent to the New York City Housing Authority?

A. No, I did not say that.

Q. What document did you sign?

A. I didn't say I signed something. You asked me my name. I said I go by David Green. He said you shouldn't do that. Doesn't mean you signed something.

Q. So that's why you stopped using the name David Green?

A. Correct.

Q. Any other reason?

A. No.



DOVID KLEINER                                           June 18, 2026
BATISTA vs EDELMAN SCHWARTZ PLLC                        97–100

Page 97

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  And you understood the Judge to be telling you that it's improper to use the name of an alias, is that correct?  Is that what you understood her to mean?

A.  You shouldn't use a name -- you should not use David Green.  If you use David, use David, but the last name should not be David Green.

Q.  So, did you start using the a different alias?

A.  It's not an alias.

MR. BERRY: Form.

Go ahead.

Slow down.

THE WITNESS: It's not an alias.  My first name is David, so they can call me David David.

BY MR. KESHAVARZ

Q.  Is your last name David?

A.  Not the last time I checked.

Q.  But why did you fill out in the form that your last name was David?  That's Exhibit B.

Page 98

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  That's a valid question.

Q.  That a what question?

A.  A valid question.

Q.  So what is the answer?

A.  I don't have an answer for you.

Q.  Who would have an answer?

A.  I couldn't tell you.

Q.  Okay.  And during this time period when this document was signed, you used the name David David generally on all of the landlord-tenant-related documents you send to government agencies, correct?

A.  I don't know that.

Q.  You used the name David David for most of the documents you signed related to property management that you sent to the government, is that true?

A.  I don't recall.

Q.  You used the name David David pretty regularly?

A.  Not recently.

Page 99

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  But during the time period of 2015 you used the David David regularly as the name for your property management duties, right?

A.  I don't know.

Q.  Who knows?

A.  Look it up.  Check it out.  Research it.  Let me know.

Q.  You realize you are under oath?

A.  100 percent.

Q.  You are subject to perjury, you understand that, right?

A.  100 percent.  I don't know.  I can't tell you.

MR. KESHAVARZ: I'm going to ask the court reporter to mark this after the deposition as Exhibit C.

Bates stamp numbers 1915 556 to 557.

* * * * * * *

(Plaintiff's Exhibit C, New York City Housing Authority Leased Housing Department Landlord

Page 100

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Certification for Conditional Permission for a Family Member/Additional Person to Live with a Section 8 Family, consisting of 2 pages Bates stamped 1915_000556 and 557, is marked for identification.)

* * * * * * * * *

(At which time, Plaintiff's Exhibit C was shown to the witness.)

* * * * * * * * *

MR. BERRY: Form.

THE WITNESS: For Additional Person to Live with Section 8 Family.

BY MR. KESHAVARZ

Q.  And this is the type of document you would sign as part of your duties as a property management agent, right?

A.  Not my duties to sign it.

Q.  I'm sorry?

A.  It's a choice I have to make.

Q.  As part of your duties as a property manager, you regularly sign documents



Page 101

DOVID KLEINER         THURSDAY, JUNE 18, 2026

like Exhibit C, right?

A. Indeed. Repeat.

Q. As part of your duties as a property manager you regularly sign documents such as Exhibit C, correct?

A. I don't recall.

Q. How many tenants have you done property management for over the 28 years you have been a property manager?

A. Not a lot of them are Section 8, so I don't remember what forms I sign, what I don't sign.

Q. Right, but you currently manage 1,500 properties, right?

A. Yes.

Q. You have been managing properties for 28 years, right?

A. Correct.

Q. So, you have been managing thousands of Section 8 tenants during your time as a property manager, correct?

A. Correct.

Q. And you know all your

Page 102

DOVID KLEINER         THURSDAY, JUNE 18, 2026

responsibilities as a property manager for those tenants, right?

A. No, I don't know all of my responsibilities.

Q. You know what your responsibilities are as a property manager for Section 8 tenants for buildings you that you manage, correct?

A. No.

Q. You don't know those. Okay. So, you are managing properties for Section 8 tenants, thousands of them, but you don't know?

A. I don't have thousands of Section 8 tenants. Sorry.

Q. You do have 1,500 tenants right now and you have been doing --

A. 1,500 tenants. How many are Section 8, minimal.

Q. How do you know?

A. Because I know. Minimal Section 8 tenants.

Q. All right. Leave a line here and I will ask you

Page 103

DOVID KLEINER         THURSDAY, JUNE 18, 2026

when you review the transcript to find out of the 1,500 tenants you currently do property management for approximately how many are Section 8.

A. No problem.

_____

Q. So, for the last 28 years would it be fair to say that you have done property management for hundreds of Section 8 tenants, right?

A. No.

Q. Do you have any idea for the last 28 years how many Section 8 tenants you have done property management for; 100, 1,000, 1,000,000?

A. 1,500 can be 1,000 or 100,000. Your numbers are off.

Q. Did you do property management for hundreds of Section 8 tenants in the last 28 years?

A. Definitely not.

Q. You have to wait until I finish the question.

A. You asked the question once.

Page 104

DOVID KLEINER         THURSDAY, JUNE 18, 2026

Q. Wait until I finish, please. For the last 28 years that you have been doing property management services would you say that you have been doing property management for hundreds of Section 8 tenants?

A. Are you done?

Q. Is that correct?

A. Are you done?

Q. Yes.

A. Definitely not.

Q. Are you certain?

A. Yeah.

Q. About how many have you done Section 8 property management services for in the last 28 years?

A. That I don't know for sure.

Q. Less than 100?

A. Definitely.

Q. Less than 100?

A. Definitely.

Q. Less than 100?

A. I think so.

Q. Less than 50?



Page 105

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  I can't tell you.

Q.  Is that your signature on the second page Bates stamped 557?  Is that your signature on the document?

A.  Looks like it.

Q.  And that's Exhibit C.  And you signed it as David David, right?

A.  That's my signature.

Q.  And this is now 2014, correct?

A.  12/24/2014 is what it says on the document.

Q.  Why were you printing your name as David David and signing it as the management agent when your name is not David David?

A.  Good question.

Q.  Why did you do it?

A.  I don't know.

Q.  When you sign documents you send to a government agency, you understand what the documents are, right?

A.  What is the statement that you made?

Q.  Is that correct?

A.  That is a statement that you made?

Page 106

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  When you sign government documents that you send as a property manager, you understand the documents that you sent, correct?

MR. BERRY: Form.

THE WITNESS: I try.

BY MR. KESHAVARZ

Q.  You can answer.

A.  I said I try.

MR. BERRY: Try.

THE WITNESS: I try to know what I sign, but I don't always good at that.

MR. KESHAVARZ: I would like the court reporter to mark this as Exhibit D at the end of the deposition.

* * * * * * *

(Plaintiff's Exhibit D, New York City Housing Authority Leased Housing Department Certification of Completed Repairs, consisting of 1 page Bates stamped 1915_000563, is marked for identification.)

Page 107

DOVID KLEINER          THURSDAY, JUNE 18, 2026

* * * * * * * * *

BY MR. KESHAVARZ

Q.  And this is a certification for completed repairs that you did on behalf of 1915 Realty for the unit that is for Damian Batista, correct?

* * * * * * * * *

(Brief pause while witness reviews document.)

* * * * * * * * *

A.  Looks like it.

BY MR. KESHAVARZ

Q.  And on the bottom it is now 2016, and still you are signing it as still David David.  Why is that?

MR. BERRY: Form.

THE WITNESS: Still objecting to the fact that I shouldn't sign David Green, so I did David David.

BY MR. KESHAVARZ

Q.  You signed it as David David because you knew you weren't supposed to use David Green, so that's why you signed

Page 108

DOVID KLEINER          THURSDAY, JUNE 18, 2026

it as David David?

A.  Correct.

Q.  Why didn't you sign it as David Kleiner?

A.  I explained that to you already.

MR. BERRY: Form.

Go ahead and answer the question.

THE WITNESS: I told you already why I don't like putting Kleiner down.

BY MR. KESHAVARZ

Q.  Don't like to what?

A.  I don't like to put my last name down on documents.

Q.  Son documents you essentially to the government?

A.  On documents.  Any document.

Q.  So you don't like to use your legal name in any document, including any document you send to the government in relation to the Section 8 program, right?

A.  Statement that you made.  I didn't



Page 109

DOVID KLEINER          THURSDAY, JUNE 18, 2026

say that.

Q. Is it a true statement?

A. I don't know.

Q. Who would know?

A. I can't tell you.

Q. Okay.

Generally, you would sign documents that you have sent to the government agencies in relation to the Section 8 program by either David David or David Green, correct?

A. I don't know.

Q. Who would know?

A. You.

MR. KESHAVARZ: I call for the production of documents related to the Section 8 program that Mr. Kleiner had submitted to government agencies using an alias such as David David, David Green or whatever it is that he uses.

MR. BERRY: Taken under advisement.

Page 110

DOVID KLEINER          THURSDAY, JUNE 18, 2026

**REQUEST**

MR. KESHAVARZ: I think we're up to Exhibit D now. Bates stamp 563. Exhibit D.

I believe I'm on E.

Exhibit E is Bates stamp number 563.

BY MR. KESHAVARZ

Q. And this is another certification that you sent to a government agency, correct, in relation to the Section 8 program, correct?

MR. KESHAVARZ: Withdraw that.

MR. BERRY: Again, sounds to me like something is being screen shared, but I'm not seeing anything being screen shared.

MR. KESHAVARZ: I will turn it off.

MR. BERRY: I'm not seeing anything.

MR. KESHAVARZ: All right.

Page 111

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. Going back to Ms. G, what is her role in relation to landlord-tenant nonpayment lawsuits?

A. We request documents. She sends documents.

Q. Ms. G, on a regular basis, sends documents requested by landlord-tenant law firms that they hire at their request, right?

A. Correct.

Q. That's her main job?

A. No.

Q. What else is her main job in relation to landlord-tenant litigation?

A. Send the documents to regular tenants also.

Q. What?

A. That are requested. Regular nonpayment cases. There is other tenants. They are a minority, the Section 8 tenants over here.

Q. All right.

But, for nonpayment actions, that's

Page 112

DOVID KLEINER          THURSDAY, JUNE 18, 2026

her main job?

A. No.

Q. What is her main function?

A. I have no idea. Whatever I ask her to do, she does. I have no idea.

Q. Who is Ms. Ward?

A. I have no idea.

Q. Who is Ms. Berman?

A. No longer works here.

Q. She is on staff at your office?

A. I don't hear you.

Q. She was former staff at your office?

A. I don't hear you.

Q. She was a former person at your office that regularly sent documents to landlord-tenant lawyers that you hire for your nonpayment evictions, right?

A. Possibly. There are many roles in this office.

Q. How often do you go to the property at 1915 Billingsley Terrace?

A. At least once a month.

Q. Have you ever spoken to Mr. and



Page 113

DOVID KLEINER            THURSDAY, JUNE 18, 2026

Mrs. Batista?

A.  I don't recall.

Q.  Would it be unusual for you not to speak to tenants?

A.  I see tenants in the hallway, I say hello, if they have a question, I will say hello to them.  They ask the questions, I'm here to be of service.

Q.  What service do you provide to Section 8 tenants?

A.  Same as everybody else gets.

Q.  Nothing different, correct?

A.  We try to make everybody happy. That's our goal.

Q.  How many properties do you personally own?

A.  Pieces of many buildings.

Q.  You have an ownership interest in many different buildings, is that what you mean?  What do you mean by "pieces of buildings"?

A.  I have pieces of.  I have percentage in the building.

Q.  Okay.

Page 114

DOVID KLEINER            THURSDAY, JUNE 18, 2026

And you have percentage of the various LLC's that you do property management for, right?

A.  Correct.

Q.  And most of the LLC's that you do property management for, you have an ownership interest in, is that true?

A.  True.

Q.  Would you say just about all of the properties that you do property management services for are buildings that you have an ownership interest in?

A.  Yes.

Q.  Generally, is it true that for the LLC's that you have and ownership interest, that you manage, that is true that you have a majority share generally?

A.  Definitely not.

Q.  What is the range of your shares of ownership in the LLC's roughly?

A.  Ten to thirty percent.

Q.  And who are the other major

Page 115

DOVID KLEINER            THURSDAY, JUNE 18, 2026

shareholders of the LLC's that you do property management for?

A.  There is different partners in every building.

Q.  Who are the largest partners?

A.  It's split up evenly, ten, twenty percent.  There is five guys.  There is no big boys.  We're all small-minded guys.  Everybody put in a few dollars.

Q.  So, there are five people that split roughly evenly their ownership interests in the LLC's that you do property management for?

MR. BERRY: Form.

THE WITNESS: Not exactly. Some have twenty.  Some have five.  Some have twenty-five. There is no written rule.

BY MR. KESHAVARZ

Q.  Okay.

Generally, in that range, those five people have range of ownership for those all those LLC's, right?

Page 116

DOVID KLEINER            THURSDAY, JUNE 18, 2026

A.  Possible.

Q.  For most of the LLC's those five people have a range of ownership interest?

A.  I don't know exactly what every one has.

Q.  But you know generally those five individuals have ownership in the LLC's that you do property management for, correct?

A.  Possibly.

Q.  Who are these five people?

A.  Robert Isaac.

Q.  A little slower.

A.  Robert Isaac.  SF Family Trust. Every building has different partners.

Q.  But you said five partners?

A.  I didn't say five.  For example, there is five partners, in 1915.  You have one guy has five percent, one has ten percent.  It varies.  There is no written rule.

Q.  Okay.



Page 117

DOVID KLEINER          THURSDAY, JUNE 18, 2026

But whatever the specific percentages are, generally there are about five people, same five people who have an ownership in the different properties generally speaking, is that true?

MR. BERRY: Form.

THE WITNESS: If that's what you want to believe. I don't know exactly what it is.

MR. BERRY: Try to answer the question.

THE WITNESS: I don't know exactly.

MR. BERRY: Just try to give a succinct answer. I'm trying to help him out. Try to give a succinct answer to the question.

THE WITNESS: Okay. Not a problem.

BY MR. KESHAVARZ

Q. What are the other five owners? You said Robert Isaac, a Trust. Who else?

A. Jason Becklebaum (Phonetic Spelling)

Page 118

DOVID KLEINER          THURSDAY, JUNE 18, 2026

is in this one.

Q. Slow down.

A. Jason.

Q. Who else?

A. Mr. Neiman (Phonetic Spelling).

Q. What is Mr. Neiman's first name?

A. I don't even know. Moishe, I think.

Q. Who else?

A. That's it. I don't know.

Q. Yonah Roth has an ownership interest in this building at 1915?

A. Zero.

Q. Did he ever have an ownership interest?

A. No.

Q. What about Binoymin Herzi, another defendant here?

A. No, nothing.

MR. BERRY: It's a simple yes or no. You don't have to say anything besides no.

BY MR. KESHAVARZ

Q. Have either of those ever had a property interest at the 1915

Page 119

DOVID KLEINER          THURSDAY, JUNE 18, 2026

property?

A. No. I told you.

MR. BERRY: If the answer is no.

THE WITNESS: I told you very clearly who the partners are, but if you would like to ask, it's my pleasure.

BY MR. KESHAVARZ

Q. Did those two people have any roles in the 1915 property?

A. What does it mean, a role?

Q. Any involvement in any way, shape or form.

A. They are field managers.

Q. They are field managers for the 1915 property?

A. What?

Q. They are the field managers for the 1915 property?

A. Correct.

Q. What does that mean?

A. They go to the building, make sure the building is good. If there is

Page 120

DOVID KLEINER          THURSDAY, JUNE 18, 2026

any repair that has to be done, they check the repair. If there is a leak, there is a leak. If the hallways isn't clean, you make sure it's cleaned.

Q. Anything else?

A. I don't know. I'm not sure.

Q. All right.

A. Do whatever needed to do to make the building run properly.

Q. All right. If tenants for the property that you manage is on Section 8, is there any circumstance where they are liable for the government's share of the rent?

A. Repeat it, please.

Q. For tenants that you are property management for who are on Section 8, are there any circumstances under which they are liable for the Section 8 share of the government -- of the rent?

A. Who is "they"?



Page 121

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  For the properties that you manage, are tenants who are on Section 8 program ever responsible for the government's share of the Section 8 of the contract rent?

A.  I assume so.

Q.  Under what circumstances?

A.  I don't know.  How does Section 8 program work?  You want to help me to tell me?

Q.  You don't know?

A.  Section 8 has its share.  Tenant have a share.  Sometimes Section 8 has full share.

Q.  Is there any circumstances where the tenant is responsible for the Section 8 share?

A.  Sure.

Q.  Under what circumstances?

A.  Sometimes they are still on based on their income, I think.  I'm not sure.

Q.  I don't many to be disrespectful.  You mumbled a bit.

A.  Sometimes a tenant has a share.

Page 122

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Sometimes they don't have a share.  Sometimes Section 8 pays the full rent.  Sometimes the tenant pays the full rent.

Q.  My question is were there any circumstances under which Section 8 tenants would be responsible for the government's share of the rent?

A.  Sure.

Q.  Under which circumstances?

A.  To get requirements of the program.  I don't know the requirements of what the rules are.

Q.  But your property management company gets the payments from the Section 8 program for tenants who are on Section 8 properties you manage, right?

A.  Sounds good.

Q.  Is the answer yes or no?

A.  I don't hear the question.

Q.  For the Section 8 tenants on the properties that you manage, payments from the Section 8 program goes to

Page 123

DOVID KLEINER          THURSDAY, JUNE 18, 2026

you, right?

A.  They go to the building.

Q.  No, but they go to -- they are delivered to your property management agency, right?

A.  Delivered to where?

Q.  The property management company, your property management company, the payments for Section 8, the government's share, they are delivered to your office?

A.  Yes.

Q.  To your P.O. box, correct?

A.  Correct.

Q.  And then you make sure -- your property management company makes sure that the government is sending the correct amount for the Section 8 program for your tenants that you do property management for, right?

A.  No, they don't.

Q.  They don't what?

A.  The Section 8 does not pay what they are supposed to pay always.

Page 124

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Okay.  But you are responsible -- your property management company is responsible for keeping track of payments made by the Section 8 program for tenants for the properties that you manage, right?

A.  I enter what they give me.  Doesn't mean it's correct.

Q.  But you keep track and make sure that the amount you get is correct?

A.  No, it's not correct.  Even what I have received is not correct.

Q.  But one of your job responsibilities as a property manager is to make sure to try to get the correct amount from the Section 8 program?

A.  We can try.

Q.  That's your job as property management?

A.  Not my job.  We try to collect the money.  We try to get what we're supposed to.  Doesn't always happen.

Q.  But it's your job to determine how



Page 125

DOVID KLEINER          THURSDAY, JUNE 18, 2026

much?

MR. BERRY: Let him finish the question. Give me time to object.

If you answer him without me being able to assert a form objection, we lose your ability to say the question was unfair or confusing.

You have got to give me time to lodge an objection. I'm serious.

THE WITNESS: Got you.

MR. BERRY: Thank you.

BY MR. KESHAVARZ

Q. When I say the term "contract rent", I mean the rent on the lease, total rent. My question is if the contract rent goes up, but the Section 8 share doesn't go up, the tenant in the Section 8 program is not responsible for that, is it?

A. I don't know why not.

MR. BERRY: If you want him

Page 126

DOVID KLEINER          THURSDAY, JUNE 18, 2026

to clarify it, clarify it, but you need to respond to the question.

If you want further clarification of the question, ask for it.

THE WITNESS: I don't know what Section 8 does and doesn't do.

BY MR. KESHAVARZ

Q. But you know how much money you want to get, right?

A. I know what the legal rent is supposed to be.

Q. And you know what Section 8's share is supposed to be for the tenant you do property management for?

A. No, I don't.

Q. Do you determine what Section 8's share is supposed to be for the Section 8 tenants that you do property management for?

A. I don't know that.

MR. BERRY: Form.

Page 127

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. The property management company isn't responsible for determining that?

MR. BERRY: Form.

THE WITNESS: Definitely not.

BY MR. KESHAVARZ

Q. Your property management company doesn't determine whether the landlords are getting the proper amount from the Section 8 program? That's not part of your responsibility?

A. No.

Q. So, let's talk about the partial collapse of the building at 1915. That happened around December of 2023, right?

A. Okay.

Q. Does that sound roughly right?

A. Sounds good.

Q. And the government agency said that the Batistas can't be charged more than $1.00 a month in rent for a certain period of time, is that

Page 128

DOVID KLEINER          THURSDAY, JUNE 18, 2026

correct?

A. That's true.

Q. And you got as part of a lawsuit that included the Batistas, not this one, but a lawsuit related to the collapse, partial collapse, you were supposed to pay the Batistas about $2,500. Does that sound right?

A. Give them a credit. Not paid.

Q. That credit for the tenants was supposed to be credited towards the tenant's share, correct?

MR. BERRY: Form. Go ahead.

THE WITNESS: I don't know. I'm not sure. $2,500 credit. I'm not sure you are right.

BY MR. KESHAVARZ

Q. So, for the Batistas, you applied the $2,500 credit to the government's share, not their share, is that correct?

A. I don't know that.



Page 129

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  If that is what you did, is that what you were supposed to do as part of the settlement?

A.  The apartment was supposed to get $2,500 credit.  The apartment.  I can't tell you how it was split up, who was supposed to get the credit.

Q.  How would you go about determining that?

A.  I'm assuming if the tenant has a balance on the account, it would go towards the balance, whatever the balance was.

Q.  So, when you provided your law firm the balance for the Batistas' rent, you just gave a credit for the total amount of the contract, you didn't give a credit for their share?

A.  I don't know.  You made a statement.  I don't know.

Q.  Okay.
    For the tenants that were supposed to get a $2,500 rent credit, did you inform the law firm how to apply that

Page 130

DOVID KLEINER          THURSDAY, JUNE 18, 2026

credit, if it's supposed to go to the government's share or the tenant's share?

A.  I don't know.

Q.  To make sure I'm clear, did you tell the law firm for the Batistas whether to apply the $2,500 to the government's share or to the tenant's share?

A.  I don't recall.

Q.  And should you have told the law firm that the money, the credit should have been applied to the tenant's share and not the landlord's share?

A.  I don't know that.  You just said that.  I don't know that.

Q.  Okay.
    What do you know about that vacate order related to the partial collapse of the building?

A.  Good question.

Q.  What do you know about the vacate order?

        MR. BERRY: Form.

Page 131

DOVID KLEINER          THURSDAY, JUNE 18, 2026

        THE WITNESS: I'm not understanding.

        MR. BERRY: Can you ask a more specific question?  It's legitimately an impossible question to answer.

BY MR. KESHAVARZ

Q.  For the 1915 property, for the partial collapse, was there a vacate order issued by the government?

A.  No.

Q.  And what were your responsibilities to the property management company based on that vacate order?

A.  I have no idea my responsibilities.

Q.  You have no idea?

A.  No.

Q.  Are you familiar with the Williams Consent Decree related to the Section 8 program and other programs?

A.  Definitely not.

Q.  Do you know what the responsibilities as a property management company you are supposed to have in the lawsuits

Page 132

DOVID KLEINER          THURSDAY, JUNE 18, 2026

that you file against Section 8 tenants?

A.  No.

Q.  As a property management company do you know what your responsibilities are in the lawsuits that you file against Section 8 tenants in the NYCHA program?

A.  No. Like I said before, I told you I give the ledger to the lawyer and let the lawyer get paid for what he is supposed to be doing.

Q.  Do you ever make sure that there is a notice given to NYCHA for certain Section 8 tenants prior to the filing of the nonpayment petition?

A.  I told you, I give it to the lawyer.  I don't get involved in this stuff.

Q.  So, you don't know whether NYCHA is supposed to be given a notice when you file a nonpayment petition against the Section 8 tenant that has NYCHA?

A.  I told you, I give it to the lawyer.



Page 133

DOVID KLEINER          THURSDAY, JUNE 18, 2026

The lawyer gets paid to do whatever has to be done.

Q.   You don't know the answer to the question?

A.   I don't know the answer.

Q.   Then, more generally, do you know the answer is about what if the nonpayment petitions for Section 8 tenants are supposed to disclose under the petition that depends on Section 8?

A.   No idea.

Q.   But you regularly see the nonpayment petitions for the 1,500 properties that you manage, right?

A.   No, I don't see that.

Q.   You don't regularly see them?

A.   No.

Q.   As a matter of course, you don't see the nonpayment petitions that you authorized to be filed as the property manager?  You don't see those petitions for the properties that you manage that you direct the

Page 134

DOVID KLEINER          THURSDAY, JUNE 18, 2026

law firm to file suit on, you don't see those petitions?

MR. BERRY: Form.

Go ahead.

THE WITNESS: I'm not sure what I see, what I don't see.

You want to see my papers? I have papers upon my desk. There is more papers on my desk.

MR. BERRY: Just answer the question.

THE WITNESS: I have no idea. I get tons of papers.  I don't see every paper.

MR. BERRY: I have to go off the record.

* * * * * * * * *

(At which time, a discussion was held off the record, after which time the deposition resumed.)

* * * * * * * * *

MR. BERRY: Need to speak with David.

Do you want to take a lunch

Page 135

DOVID KLEINER          THURSDAY, JUNE 18, 2026

break now, 30 minutes?

MR. KESHAVARZ: I haven't ordered lunch yet.

MR. BERRY: When would you like to take a 30-minute break for lunch?

MR. KESHAVARZ: 2:00.

Let's go off the record for a second so I can order lunch. I will be right back with you.

* * * * * * * *

(At which time, a brief recess was taken, after which time the deposition resumed.)

* * * * * * * *

MR. KESHAVARZ: Back on the record.

BY MR. KESHAVARZ

Q.   So, have you noticed before in the nonpayment petition that you direct law firms to file if the tenant is on Section 8?

A.   No.

Q.   Did you notice that the lawsuits that

Page 136

DOVID KLEINER          THURSDAY, JUNE 18, 2026

you directed lawyers to file say that the tenant is on NYCHA?

A.   I don't know.

Q.   Have you ever noticed whether the lawyers that you direct to file suits ever give pre-suit notice to NYCHA or Section 8 tenants for nonpayment?

A.   I'm assuming the lawyer does whatever he has to do.

Q.   Can you recall a specific instance where the petition that you had that your lawyers file, can you recall a single instance where it indicated that the tenant was on Section 8?

A.   I don't recall.

Q.   Can you recall a specific instance where the attorneys that you hired gave a pre-suit notice to the NYCHA program?  Do you recall a specific instance of that ever happening?

A.   I don't recall.

Q.   And then do you recall any specific instance that your lawyers indicated on the petition that the tenant was



Page 137

DOVID KLEINER        THURSDAY, JUNE 18, 2026

on that notice was provided to NYCHA? Can you think of a specific instance that has ever happened?

MR. BERRY: Form.

Go ahead.

THE WITNESS: I don't remember.

BY MR. KESHAVARZ

Q.  Are you familiar with the DHCR rent reduction orders?

A.  Sure.

Q.  What is it?

A.  DHCR is a program that responds accordingly.

Q.  But do you know what a rent reduction order is by DHCR?

A.  The tenant is granted $1.00, so yes, I have heard of that.

Q.  And do you tell the lawyers that their tenants that you directed to sue have a rent reduction order?

A.  If I remember, then I tell them.  If I don't remember, then I don't tell them.

Page 138

DOVID KLEINER        THURSDAY, JUNE 18, 2026

Q.  Did you tell the law firm that you used to sue my clients that my clients had a rent reduction order?

A.  Probably not because I don't think anybody has a rent reduction for more than a month, most, thirty days, forty days and they get $1.00 reduction, so if they had a reduction, it says on the bill only $1.00 so they don't have to know anything more than that.

Q.  What do you mean by that?

A.  If there is a rent reduction, the rent was restored so if it was reduced to $1.00, then I would fix it on the $1.00 and they wouldn't sue them for that period of time.

Q.  So, are you saying that you would inform the law firm that there was a rent reduction order by putting the reduced amount as the balance due for that month, is that what you mean?

A.  That's not what I said.  I said on the ledger it would say $1.00, that

Page 139

DOVID KLEINER        THURSDAY, JUNE 18, 2026

means they had a rent reduction and they will not sue them for that amount.

Q.  But for that month there is a rent reduction order that says the tenant's share is supposed to be $1.00, does it still list a contract rate as being due for that month?

A.  I don't know.

Q.  Should it?

MR. BERRY: Form.

THE WITNESS: I really don't know what it should be.  I can't tell you what it should be.

BY MR. KESHAVARZ

Q.  But your organization, your property management company is responsible for accurately sending an accurate tenant letter to your lawyers, right?

MR. BERRY: Form.

THE WITNESS: That's what you said.

BY MR. KESHAVARZ

Q.  I'm asking you.

Page 140

DOVID KLEINER        THURSDAY, JUNE 18, 2026

A.  You are saying.

MR. BERRY: No, David, you have got to listen to his question.  You cannot argue with the premises of the question. You can either give an answer or you say you need it to be clarified.

THE WITNESS: Okay. Please clarify.

BY MR. KESHAVARZ

Q.  Is it your responsibility as a property management agent to provide the attorney that you hired in nonpayment petitions a ledger?

MR. BERRY: Form. Answer the question if you can.

THE WITNESS: I don't know how to answer that question. Sorry.

MR. KESHAVARZ: Let me rephrase it.



DOVID KLEINER                                    June 18, 2026
BATISTA vs EDELMAN SCHWARTZ PLLC                 141–144

Page 141

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. Did you direct your lawyer to file nonpayment petitions against tenants?

A. Correct.

Q. And you provide information to the lawyers to file those nonpayment proceedings, right?

A. Correct.

Q. Is one of your responsibilities as the property management agent to send attorneys a ledger for that tenant that they are trying to evict?

    MR. BERRY: Form.

    Go ahead.

BY MR. KESHAVARZ

Q. That's one of your responsibilities as a property management company?

    MR. BERRY: Asked and answered as to form.

    Answer again.

    THE WITNESS: I did send ledgers to the lawyers to do cases.

Page 142

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. Because that's one of your responsibilities as the property management company?

A. Who tells me my responsibilities?

    MR. BERRY: Form.

BY MR. KESHAVARZ

Q. It's a question.

    MR. BERRY: Objection.

    Okay. This is argumentative. The question has been asked and answered.

    I know you don't like the answer, but I think I know what the problem with the question is. Okay.

    If you want me to talk to you about revising the question, I would be happy to do it.

    MR. KESHAVARZ: Let me just move on.

    MR. BERRY: I think it's obvious what the problem with the question is, but I can't say

Page 143

DOVID KLEINER          THURSDAY, JUNE 18, 2026

anything without being accused of a speaking objection, so why don't you just try to rephrase it or explain to the witness what you would like to find out that you are not getting?

BY MR. KESHAVARZ

Q. All right.

    Well, let's talk about my clients for a second. There is a $1.00 rent reduction for them, correct?

A. Possibly. I don't know.

Q. So, for the tenants that were in the building that had a partial collapse, there was a $1.00 rent reduction order, meaning that they were only supposed to pay $1.00, right?

A. Not everybody.

Q. But people who were affected by the partial building collapse, they were only supposed to be charged no more than $1.00 for rent, right?

A. No.

Q. Some of the tenants?

Page 144

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A. Some of the tenants.

Q. Including my client?

A. I don't know.

Q. All right.

    So I just want to make crystal clear, for those tenants that, not just for the building, but generally speaking, when a tenant gets a rent reduction order, this building, any other building, for whatever reason, the government says there is a rent reduction to whatever amount. In those instances do you specifically inform your lawyers that there is a rent reduction order for those monies?

A. If I remember, then I do them.

Q. As a regular course, how would you relay that to the lawyers?

A. It's not a regular course. It's not common at all.

Q. All right.

    But when a government agency issues a rent reduction order, in your those



Page 145

DOVID KLEINER    THURSDAY, JUNE 18, 2026

instances for the 1,500 properties that you currently manage.

A.  1,500 units, not properties.  I will remind you.

MR. BERRY: Form.

Don't argue with him.

Don't try to make points.

Listen to the question.  He is going to revise the question.

THE WITNESS: Okay.

BY MR. KESHAVARZ

Q.  What does a rent reduction order mean?

MR. BERRY: Form.

THE WITNESS: I'm not sure what it means.

It means the tenant is entitled to a rent reduction usually.

BY MR. KESHAVARZ

Q.  So, it's an order from the government that you cannot charge more than a certain amount to the tenant, correct?

Page 146

DOVID KLEINER    THURSDAY, JUNE 18, 2026

A.  Possibly.

Q.  Do you know or not?

A.  I don't know exactly what the rules are.

Q.  You don't know?

A.  I know what a rent reduction is when someone makes a complaint or something and entitled to get a lower rent for a period of time.

Q.  Okay.

That's what a rent reduction order is?  Okay.

Now, do you inform the lawyers that you have to file nonpayment procedures?  Do you specifically inform them where there has been a rent reduction order?

A.  If I remember, I let them know.

Q.  As a regular course of business, for rent reduction orders generally, not just this building, do you, in fact, inform the attorneys about the rent reduction order?

A.  It says on the ledger if there is a

Page 147

DOVID KLEINER    THURSDAY, JUNE 18, 2026

rent reduction.  It says on the ledger, rent reduction, so the lawyer sees what it says.

Q.  All right.

Other than whatever the ledger says, do you inform your lawyers in any other way that there is a rent reduction order?

A.  I don't think so.

Q.  And when there is a rent reduction order, sometimes you still sue for the full contract, right?

A.  I don't know that.  I don't take care of that.  I don't sue.

Q.  Well, then let me be more specific.  When I say you sue, we understand that to mean when you direct a law firm for the LLC's to file a nonpayment petition.

A.  I send the ledger.  I don't get involved more than that.

Q.  You send a ledger to the attorneys and you direct them to file a nonpayment petition?

Page 148

DOVID KLEINER    THURSDAY, JUNE 18, 2026

MR. BERRY: Form.

THE WITNESS: If I'm entitled to send a dispo, then they do it.  If I'm not, then they don't.

BY MR. KESHAVARZ

Q.  What is the word, "dispo"?

A.  Dispossess.  Nonpayment.

Q.  Who is responsible for a Section 8 lease renewal?

A.  To do what?

Q.  For making sure that where there is a lease renewal, to make sure that it's properly credited for the Section 8 program as opposed to just reading the contract?

A.  I don't hear a question.

Q.  Who is responsible for that?

A.  I say I don't hear a question.

Q.  You don't hear a question?  Who is responsible for that?

A.  Responsible for what?

Q.  Let me restate the question.

A.  Go ahead.

Q.  Where there is a contract, a lease or



Page 149

DOVID KLEINER          THURSDAY, JUNE 18, 2026

a contract amount, who is responsible for making sure that if the tenant is on Section 8 that the renewal reflects that this tenant is on the Section 8 program?

A.  I don't know who is responsible for that.

Q.  What steps are taken for Section 8 lease renewals?

A.  Send the Section 8 lease to the tenant, they send it back and we submit it to Section 8.

Q.  What documentation is provided to Section 8 for lease renewals?

A.  I don't know.  I have no idea.

Q.  But you are the one who sends that to the Section 8 program, right?

A.  We upload whatever we get.

Q.  The answer is yes?

A.  I didn't say that.  I said we upload whatever we receive.  If we receive a lease, a package, we upload it to Section 8.

Q.  What steps are taken when Section 8

Page 150

DOVID KLEINER          THURSDAY, JUNE 18, 2026

subsidy is suspended or there is a problem with the Section 8 payment?

A.  We send an e-mail to Section 8.

Q.  Where is the documentation for Section 8 tenants?

A.  That is in a tenant share section.

Q.  Where are those stored, the documentation that you send to Section 8 tenants?  Where do you store that?

A.  In the computer.

Q.  You have a scanned copy of the document?

A.  Yes.

Q.  You have those for my client?

A.  I assume so, but I can check.

Q.  How is that accessed?

A.  It's saved on the drive.

Q.  You said you contact Section 8 when there is a problem with Section 8 payments you generally to that via e-mail?

A.  Yeah.

Q.  Who do you e-mail?

Page 151

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  Section 8.  Whatever e-mail we have.

Q.  Are you generally copied on those e-mails when there is a problem with payment?

A.  No.

Q.  Who generally sends those e-mails out to Section 8 when there is a problem with payment?

A.  Ms. G.

Q.  When are lease renewals sent to Section 8?

MR. BERRY: Form.

THE WITNESS: After the lease expires.

BY MR. KESHAVARZ

Q.  That happened for my clients?

A.  I can't tell you.

Q.  If a lease renewal was sent to Section 8 late or it is missing documentation, what happens?

A.  The truth, Section 8 doesn't update it anyway, so it's never late.

Q.  How would delays for the Section 8 lease renewal be communicated to the

Page 152

DOVID KLEINER          THURSDAY, JUNE 18, 2026

person who is responsible for the rent ledger?

A.  Who are you talking about communicating with?

Q.  With the person in your office who is responsible for generating the rent ledger.

A.  Who is responsible for the rent ledger?

Q.  So, in other words --

MR. BERRY: Are you withdrawing the question, amending it?

MR. KESHAVARZ: Let me rephrase.

MR. BERRY: Okay.

BY MR. KESHAVARZ

Q.  If there is a delay with the Section 8 lease renewal because the application is sent late or there is missing documents, if there is a delay to the Section 8 renewal, how would that be reflected in the rent ledger, if at all?



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
153–156

Page 153

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  As long as my things go out automatically, timely.  So as far as I'm concerned, my stuff is timely.  If Section 8 doesn't update it, not my issue.

Q.  But what if your office, in fact, sent the lease renewal to Section 8 tenants?

A.  My office, essentially 120 details later and uploads when we get it back.

Q.  Sometimes your office sends the lease renewal late, Section 8 lease renewal late?

A.  Are you saying that?

Q.  Sometimes that happens?

MR. BERRY: Ask if it happens.
Objection to form.
Presumes facts not in evidence.
Go ahead and answer if you can, but I think the question should be restated.

MR. KESHAVARZ: Let me

Page 154

DOVID KLEINER          THURSDAY, JUNE 18, 2026

restate it.

BY MR. KESHAVARZ

Q.  Sometimes you send the lease renewal to Section 8 late, correct?

A.  No.

Q.  You have never done that?

A.  No.

Q.  Sometimes you send the lease renewal to Section 8 missing documentation that's required, correct?

A.  No.
Why should I accept something that's not correct?

MR. BERRY: If the answer is no, that's the answer.  You don't argue with Mr. Keshavarz.

BY MR. KESHAVARZ

Q.  Is that specifically true for my clients, you didn't send the lease renewal late to Section 8, you didn't sent the renewal missing documents, right?

A.  Not that I know about.

Q.  And if the Section 8 doesn't update

Page 155

DOVID KLEINER          THURSDAY, JUNE 18, 2026

its records timely for whatever reason, but the tenants are still not supposed to pay the Section 8 share, what are steps do you do to make sure the tenant is not charged for an amount that they are not liable for?

MR. BERRY: Form.
THE WITNESS: I'm not sure they are not responsible.  I don't know what the law is, who is responsible, not responsible.  I do my job and I don't know who is responsible.

BY MR. KESHAVARZ

Q.  So, your job as the property management agent you don't have a responsibility to make sure that the ledger that you sent to the tenant, to the lawyers, properly reflect the Section 8 share, correct?

A.  I have might have the lease signed.  As far as I'm concerned, that's what it is.  I don't bill if it's not signed.

Page 156

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Yeah, but my question is are you saying -- and I'm just asking -- that if Section 8 doesn't correct the renewal, doesn't update your records because it believes that it got the renewal late or, in fact, got the renewal late, do you inform that to the lawyers that you have filing suit?

MR. BERRY: Form.
Go ahead.
THE WITNESS: I'm totally losing it.
I get my documents.  I upload it.  If Section 8 doesn't load it, I don't know what you want.
I'm trying to understand you.

BY MR. KESHAVARZ

Q.  Who is responsible for just addressing HQS violations?

A.  The manager has to make sure that they get the violations certified.



Page 157

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Okay.

But your property -- ultimately it's your property management company that's responsible for addressing HQS violations, is that correct?

A.  Okay.

Q.  Is that true?

A.  We have to make -- 1915 Realty has to make sure they address the HQC violations.

Q.  But you're responsible as the managing agent?  What is the name of your property management company again?

A.  DKCK Management.  KHAYA.  29 years.

Q.  So, my question was is DKCK responsible to make sure that steps are taken to address HQS violations?

A.  It's our responsibility to make sure we address this, yes.

Q.  What steps, duties and responsibilities take to address HQS violations?

A.  We take the violation, give it to the

Page 158

DOVID KLEINER          THURSDAY, JUNE 18, 2026

super, make sure he does his job.  We get the tenant to sign that the work was done.  If the tenant doesn't have a project, then the manager takes care of it.

Q.  Who in the office receives the HCR rent reduction orders?

A.  Me.

Q.  What steps are taken when a DCH rent reduction order is received?

A.  Take it, look at the rent.  There was a rent reduction.  Make a work order to repair it and we get the work order and sent it back to the HR and show that it was completed.

Q.  Anything else?

A.  I'm not sure.

Q.  Any steps that you take when a rent reduction order is received in relation to the amount that is charged to the tenant?

A.  Told you, we put it into the ledger as a rent reduction.

Q.  Where is information from DHCR

Page 159

DOVID KLEINER          THURSDAY, JUNE 18, 2026

stored?

A.  Scan it.

Q.  How is that accessed?

A.  The file.

Q.  It's digitally scanned and accessed?

A.  Yes.

Q.  You produced all those?

A.  I have no idea.

MR. BERRY: Object.
Direct the questions of what has been produced to me.
We will leave a blank in the record and we'll respond.

MR. KESHAVARZ: Okay.

**INFORMATION INSERT**

(INSERT)_____

_____

_____

* * * * * * * * *

BY MR. KESHAVARZ

Q.  Are there any documents related to my clients that you have not provided to your attorney?

A.  I don't know.

Page 160

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: If you know.

THE WITNESS: I don't know.

BY MR. KESHAVARZ

Q.  What steps did you take to determine whether the documents related to my clients have been turned over to your attorney?

A.  Whatever your attorney asked for, I think I tried my best to give whatever he requested.

Q.  But you are the person who are gathering the documents to provide to your attorney related to my client, correct?

A.  Yes.

Q.  You are the one responsible?  You are the one who is doing that, right?

A.  What?

Q.  Are you the one who was gathering the documents to be turned over in this lawsuit?

A.  I was giving it over.  Someone in the office, if I wasn't getting it, I have someone else in the office



Page 161

DOVID KLEINER        THURSDAY, JUNE 18, 2026

taking care of it.

Q.  You made sure that all the documents related to my client?

A.  Yes.  Whatever you requested, we tried to make sure he gets whatever he needed.

Q.  You have to let finish the question on the record.

A.  No problem.

Q.  You are the one that made sure all the documents related to my clients and the nonpayment petition was produced, you were the one responsible?

A.  To the best of my knowledge.

MR. BERRY: Objection to the form of the question.

BY MR. KESHAVARZ

Q.  How is a tenant's account marked to show there was a DHCR rent reduction order?

A.  In the letter it says DHCR rent reduction.

Q.  Who is responsible for checking that

Page 162

DOVID KLEINER        THURSDAY, JUNE 18, 2026

it is applied correctly?

A.  There is nobody responsible.  When it comes in, I try to make sure I give it to the lawyer to enter.  Nobody is responsible.

Q.  Well, you are responsible for giving it to your staff to enter into your system to correct the amount that's actually owed, right?

A.  Yes.

Q.  Who do you give it to, usually?

A.  Depends on the day.

Q.  Whose job is that usually?

A.  What?

Q.  Whose job is that usually?

A.  To do what?

Q.  To update your records for the rent reduction order.

A.  What did you say?

Q.  Who is responsible for updating your property management company when there is a rent reduction order?

A.  I'm responsible.

Q.  And what steps were taken to request

Page 163

DOVID KLEINER        THURSDAY, JUNE 18, 2026

a rent restoration?

A.  Give it to the girl to file the rent restoration.  As soon as the work was done, take pictures of proof that it was done.

Q.  What steps are taken when a rent restoration is denied?

A.  Does not get removed from the ledger.

Q.  No, when the rent restoration is denied, what happens?  What steps are taken when the rent restoration is denied?

A.  I will look at it and see what has to be done to get it done properly.

Q.  All right.

So, when you say it's your job -- during the deposition you said, it's my job, it's my job.  Generally, that would mean that would generally also be asked of the Batista's, that's your general job?

A.  Why would I ask the Batistas for the rent reduction?

Q.  What software do you use to generate

Page 164

DOVID KLEINER        THURSDAY, JUNE 18, 2026

rent bills and rent leases?

A.  Rent Riter.

Q.  Is that for both the rent and ledgers and the rent bills?

A.  Yes.

Q.  And is there a document somewhere that shows how Rent Riter works?

A.  No.

Q.  Is there like a website that you have access to that shows how the software works?

A.  No.

Q.  And you use that in relation to the accounts that you send over for suit to your lawyers, right?

A.  Correct.

Q.  How do you generally communicate with the lawyers?

A.  E-mail.

Q.  And how do you communicate the amount owed to the lawyers?

A.  On the ledger.

Q.  Who is responsible for generating and sending out rent bills to tenants?



DOVID KLEINER                                    June 18, 2026
BATISTA vs EDELMAN SCHWARTZ PLLC                  165–168

Page 165

DOVID KLEINER            THURSDAY, JUNE 18, 2026

A.  Comes into the office.

Q.  DKCK is responsible?

A.  Correct.

Q.  How are the rent bills generated?

A.  Rent Riter.

Q.  How is the decoder charge determined?

A.  What the lease says.

Q.  Is a document called the Tenant Profile one of the documents that were generated from Rent Riter?

A.  It's a tenant statement.

Q.  How are arrears determined?

A.  The month the rent is let's say $1,000, government pays $800, so the rent is $200.  That's how.

Q.  Are there any steps taken that are different if a tenant is on Section 8?

A.  No.

Q.  You don't treat the Section 8 share of the payment different than the tenant share?

THE WITNESS: One second, please.

Page 166

DOVID KLEINER            THURSDAY, JUNE 18, 2026

* * * * * * * * *

(At which time, there was a brief pause in the proceedings.)

* * * * * * * * *

MR. BERRY: Is there a question pending?

MR. KESHAVARZ: He said to wait.

MR. BERRY: I wasn't sure you were done.  Let us know when you are ready.

THE WITNESS: I'm ready.

MR. BERRY: Mike, can you please repeat the question?  Sorry.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record:  You don't treat the Section 8 share of the payment different than the tenant share?)

* * * * * * * * *

MR. BERRY: Form.

Go ahead and answer the

Page 167

DOVID KLEINER            THURSDAY, JUNE 18, 2026

question if you can.

THE WITNESS: I don't know.

MR. BERRY: Do you understand the question?

THE WITNESS: No.

MR. BERRY: Okay.

BY MR. KESHAVARZ

Q.  In the way that DKCK keeps track of the amount owed by the tenant, is there an amount owed in its own records by Section 8 different than the amount owed by the tenant or is it just one lump sum?

MR. BERRY: Form.

THE WITNESS: It says Section 8 share and then the tenant's share.

It's not always accurate because when a tenant signs a lease, we charge them that even if Section 8 didn't update the stuff because it takes years for them to update, therefore we just go by basically what is on

Page 168

DOVID KLEINER            THURSDAY, JUNE 18, 2026

the lease.

That's what we do.

BY MR. KESHAVARZ

Q.  On the lease amount?

A.  Yes.

Q.  What do you mean by it takes years for Section 8 to update?

A.  Section 8 is very, very slow at updating leases, so it takes them very long to do it, then they go back and give you the money for two years back because they don't do things properly.

Q.  So, when Section 8 does its own record keeping, for whatever reason doesn't pay the share it's supposed to, you sue the tenant for the full contract rate and hope to get the reimbursement from Section 8 program later, is that right?

A.  I give it to the lawyer, let the lawyer deal with it.  I don't get involved.

Q.  No, but that's not what you just



Page 169

DOVID KLEINER          THURSDAY, JUNE 18, 2026

said.

A.  I said I update it according to the lease.  The tenant is on the lease.  Section 8 updates it, great.  I don't get involved.

Q.  So, if Section 8 doesn't update their records, you charge the tenant the full contract?

A.  I don't charge anything.

Q.  Your system that you put in goes the full contract rate?

A.  No, it can't be a full contract rate because just the share changes, the new contract rate is higher, but I don't know what the tenant's share is.  I have no idea.  I don't get involved with that.

Q.  All right.
    So when the tenant signs up for Section 8 and for whatever reason the Section 8 program delays payments to the landlord, you would charge the tenant the full contract?

A.  You said that.  I don't know.  I'm

Page 170

DOVID KLEINER          THURSDAY, JUNE 18, 2026

not sure.

Q.  Your software, the accounting software that you use internally --

    MR. BERRY: Are you talking about Rent Riter?

BY MR. KESHAVARZ

Q.  Is Rent Riter the accounting software that you use?

    MR. BERRY: It's not accounting software.

A.  It's tenants statements.

BY MR. KESHAVARZ

Q.  What software do you use to keep track of the accounting for the tenants?

A.  It comes into 1915, goes into Rent Riter and then --

Q.  And when what?

    THE WITNESS: One minute, please.
    * * * * * * * * *
    (At which time, there was a brief pause in the proceedings.)
    * * * * * * * * *

Page 171

DOVID KLEINER          THURSDAY, JUNE 18, 2026

    MR. KESHAVARZ: Would this be a time to take a break for lunch?

    MR. BERRY: How much time do you want?

    MR. KESHAVARZ: Thirty minutes.

    MR. BERRY: Resume at 2:30?

    THE WITNESS: Why so late?

    MR. BERRY: He is the lawyer.

    THE WITNESS: One second.  Give me one second.
    * * * * * * * * *
    (At which time, there was a brief pause in the proceedings.)
    * * * * * * * * *

    MR. KESHAVARZ: 2:30 is reasonable.

    THE WITNESS: How much more time you need?

    MR. BERRY: Let me ask these questions.

    MR. KESHAVARZ: Off the record.
    * * * * * * * * *

Page 172

DOVID KLEINER          THURSDAY, JUNE 18, 2026

    (At which time 2 p.m., a luncheon recess was held until 2:30 p.m.)
    * * * * * * * * *



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

Page 173

DOVID KLEINER        THURSDAY, JUNE 18, 2026

AFTERNOON SESSION

DOVID KLEINER,

having been previously sworn,

returned from the luncheon recess

and testified as follows:

CONTINUED EXAMINATION

BY MR. KESHAVARZ

Q.  Mr. Kleiner, we were talking before about the software system that was used.

A.  Yes.

Q.  We talked about Rent Riter, but what is the software that does the calculation of the amount that's due?

A.  Which calculations what?

Q.  Which software generates the rent ledger, I guess.

A.  Same thing.

Q.  Rent Riter?

A.  Yes.

Q.  Is that the only software you use?

A.  I use QuickBooks just for paying bills.

Q.  So, when 1915 got sold to Phelan --

Page 174

DOVID KLEINER        THURSDAY, JUNE 18, 2026

A.  Nothing changed.

Okay.

I let you ask your question.  Go ahead.

Q.  Well, you informed the lawyers that the sale happened, right?

A.  Which lawyer?

Q.  The lawyers who were filing suit on behalf of 1915.

A.  I didn't tell anything because Chase didn't sign the papers yet.

Q.  The reason is the attorneys who are defendants in this case, their account notes show Phelan as the client or as the property owner.

A.  As what?

Q.  The records of the law firm show the landlord is or the property owner is Phelan.  Does that refresh your recollection about when you might have informed the law firm in this case about the sale?

A.  Which law firm?

Q.  This one we're suing, Edelman

Page 175

DOVID KLEINER        THURSDAY, JUNE 18, 2026

Schwartz.

A.  I just told them about it recently.

Q.  After this lawsuit was filed?

A.  No, after your lawsuit?

Q.  Yes.

A.  Why would I tell them?  I just told them recently about this, in the last two months.

Q.  Okay.

So, I understand there was an issue with the mortgage, but the building at 1915 was actually sold to Phelan when the collection lawsuit against my client was filed, right?

MR. BERRY: Form.

THE WITNESS: I don't know.  I can't tell you.  I don't know.  I don't know what the course was.

MR. BERRY: I need a clear question.  You answered the question.  I'm trying to do my job.

THE WITNESS: Okay.

MR. BERRY: As I heard the

Page 176

DOVID KLEINER        THURSDAY, JUNE 18, 2026

question, it's ambiguous.

Do you mean that the ownership transfer was prior to the petition?

Is that what you are trying to find out, or are you asking whether -- because I guarantee they didn't happen simultaneously.  That would defy the law of averages.

But you made it sound like they were done in conjunction or exactly the same time, unless I misheard or misunderstood your question.

It shouldn't be that hard to find out what the sequence of events is or at least ask the question for him to tell you what he knows about the sequence of events.

MR. KESHAVARZ: Let me go and show you the ACRIS.

We're up to Exhibit E.



Page 177

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Let me show you what will be marked as Exhibit E, a New York City Department of Finance Office of the City Register, a 12-page document, and has the ACRIS filing regarding the property at 1915.

* * * * * * *

(Plaintiff's Exhibit E, New York City Department of Finance Office of the City Register document, Document ID: 2026042101004001 dated 12-10-2024, consisting of 12 pages, is marked for identification.)

* * * * * * *

(At which time, Plaintiff's Exhibit E was shown to the witness.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.   Are you able to tell from this document when the property was sold from 1915 to Phelan?

A    (No verbal/audible response from Witness to question posed by

Page 178

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Counsel.)

MR. KESHAVARZ: Well, the deed says -- on page 2 says December 10, 2024, from 1915, the grantor, to Phelan, the grantee.

BY MR. KESHAVARZ

Q.   So does this indicate to you that the building was sold from 1915 Realty to Phelan on December 10, 2024?

A.   I can't tell you.

Q.   Was the amount of the rent bill sent to my client incorrect?

MR. BERRY: Form.

MR. KESHAVARZ: You can answer.

THE WITNESS: Which one?

BY MR. KESHAVARZ

Q.   Did you send rent statements to my client alleging that they owed rent money that they did not?

A.   I have no idea.

Q.   All right.

Let me show you an exhibit that is in our lawsuit docket entry 1-3, a ten

Page 179

DOVID KLEINER          THURSDAY, JUNE 18, 2026

page document.  This document indicates that my client owed $9,190 as of the date of this statement. Page 2, it indicates on December 24, 2025 my clients owed $9,190.  My client didn't owe that amount as of the date of the statement here, right?

A.   I have no idea.

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.   My client didn't owe anything in rent on December 24, 2025, did they?

MR. BERRY: Form.

Is that your argument or your statement or your question or what is it?

MR. KESHAVARZ: It's a question.

MR. BERRY: It's your testimony.  Ask him questions.

BY MR. KESHAVARZ

Q.   The question is:  In fact, my clients didn't owe any money for rent on

Page 180

DOVID KLEINER          THURSDAY, JUNE 18, 2026

December 24, 2025 when you allege that they owed $9,190.86?

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.   They didn't owe anything, did they?

A.   I have no idea.

Q.   So, this document that we're up to, Exhibit E, this is generated by DKCK, right?

A.   No.

Q.   Who generated it?

A.   1915 Realty.

Q.   Right, but the property management company which is DKCK, their job is to print out and send out the billing statements, correct?

MR. BERRY: Form.

BY MR. KESHAVARZ

Q.   Is that true?

A.   We're supposed to give rent statements out, okay.

Q.   Is this Exhibit E or should this be F?  This should F.  My apologies.  It is the billing statements that were



Page 181

DOVID KLEINER            THURSDAY, JUNE 18, 2026

filed as docket entry 1-3.

So, anyway, just to be clear, page 2, the billing statements, DKCK generates that and sends it to the tenants, right?

MR. BERRY: Form.

Can you just ask one question and then give me a second to interject, David, if I want to object.

THE WITNESS: Yes.  You are good.  Got you.

* * * * * * *

(Plaintiff's Exhibit F, Series of 1915 Realty LLC Bills addressed to Damian and Sandra Batista, consisting of 9 pages, are marked for identification.)

* * * * * * * * *

* * * * * * *

(At which time, Plaintiff's Exhibit F was shown to the witness.)

* * * * * * * * *

Page 182

DOVID KLEINER            THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  Billing statements that are Exhibit F, those are generated and sent by DKCK, correct?

A.  I can't be specific.  I'm sorry.

Q.  What was your answer?

A.  1915 Realty manages the building.  DKCK prints out some stuff.  I can't be clear with what you want.

Q.  Really?  DKCK is the property manager for 1915 Realty, right?

A.  Yes.

Q.  So, one of their jobs for DKCK is to do an accounting of how much the tenant is alleged to be owed, right?

A.  No.

Q.  Who does that?  Who does that calculation?

A.  1915 Realty does that.

Q.  Who specifically?  Who?

A.  I don't know who does it specifically.

Q.  Does not DKCK generate the statements

Page 183

DOVID KLEINER            THURSDAY, JUNE 18, 2026

on behalf of 1915 Realty?

MR. BERRY: I would like to make a suggestion.

These all seem to be loaded questions.  They are all asking him for conclusions and he should be simply asking about the process, you know, who does what, and you know, it should just be a simple question, simple series of mechanical questions.

I don't necessarily think that his inability to answer these questions are asking for conclusions rather than a description of the process are unreasonable.  I understand that you are trying and the witness is trying also, but the questions might be a little bit less ambiguous in terms of reaching for conclusions and just trying to find out who did

Page 184

DOVID KLEINER            THURSDAY, JUNE 18, 2026

what.

MR. KESHAVARZ: Okay.  Fair enough.

BY MR. KESHAVARZ

Q.  For the LLC's that DKCK does property management services for, one of the responsibilities is to generate and send billing statements to tenants, correct?

A.  Correct.

Q.  And Exhibit F, the billing statement sent to the Batistas, that was generated by DKCK, correct?

A.  What do you mean, generate?  I'm not so smart.  You are.  I don't know.

MR. BERRY: You have to listen to the question.

The problem is I can't really say what the problem is because I'm not allowed to, but I know how I would go about this.  But that's really not anyone's concern.  Okay.

I don't think his inability



Page 185

DOVID KLEINER          THURSDAY, JUNE 18, 2026

to give the answer you are looking for is unreasonable. Let's just try one more time.

But, David, listen and try to understand what he wants and try to answer precisely. Make it more than mechanical, you know. That would be good.

These companies have the same employees and they have different employees who did what, what are they wearing, these kind of things can't simply be lumped together in one large conclusory question.

BY MR. KESHAVARZ

Q. Does 1915 Realty have any employees?

A. Sure.

Q. Who?

A. The super. There is a porter. The manager.

Q. Okay.

There is a manager?

A. Manager.

Page 186

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q. Manager, okay. And they get paid by?

A. 1915 Realty.

Q. Were you the DKCK who tells them what to do, right?

A. I didn't say that.

Q. It's a question.

MR. BERRY: Does DKCK direct the activities of those employees?

You can answer that question properly, or maybe not, but you can't put words in his mouth constantly and simply ask him whether he agrees or disagrees with you. All right?

I know I have only an objection to form, but I really don't think he is trying to be obstructive here.

MR. KESHAVARZ: Okay.

BY MR. KESHAVARZ

Q. The super, the porter and the manager that you just indicated, DKCK is the one that directs them the

Page 187

DOVID KLEINER          THURSDAY, JUNE 18, 2026

responsibilities as to what to do?

A. Partially.

Q. Who else? Anyone else?

A. I don't consider DKCK -- it's very vague whether it's 1915 or I'm employed by. It's a very vague thing.

Q. All right.

Who tells the super, the porter or the manager what to do?

A. I do, but I work for 1915.

Q. You are the managing agent of DKCK, right?

A. Correct.

Q. And you are doing that work on behalf of 1915?

A. Okay.

Q. Because you are the property manager for 1915?

A. No.

Q. You are not the property manager for 1915 realty?

A. I don't know if I'm a manager.

Q. DKCK has a contract with 1915, right?

Page 188

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A. Okay.

Q. Is that true?

A. Yeah.

Q. And the contract delineates the responsibilities of DKCK?

A. Read it again to see what the responsibilities are.

Q. The contract, the management agreement, the property management agreement delineates the responsibilities between 1915 Realty and DKCK, right?

A. I have to read it to tell you.

Q. You don't know?

A. No.

Q. Well, you know what to do as the person who runs DKCK, you know what to do for the LLC's, correct? Isn't that right?

A. I try to do what I'm supposed to do.

Q. Because you know what you are supposed to do?

A. I don't know what my full responsibilities are. I have to read



Page 189

DOVID KLEINER          THURSDAY, JUNE 18, 2026

the contract to know that.

Q.  But you know what you do on behalf of the LLC's, right?

A.  I know what I do, yes.

Q.  And those are all tasks you are supposed to do as the property management, right?

A.  I don't know.  You are mixing two different things, now.  Three things.  I have to read it.

Q.  How did you get paid for your work at DKCK?

A.  1915 Realty gives a check to DKCK.

Q.  All the LLC's give checks to DKCK, is that right?

A.  Yes.

Q.  And those bank accounts, the money is controlled, it's moved back and forth by DKCK, right?

A.  You made a statement.  I don't know if it's true.

Q.  You pay yourself from accounts that are in the name of different LLC's, right?

Page 190

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  I think the LLC's pay DKCK.  That's it.  Done.

Q.  And that's per the property management agreement, right?

A.  I don't know.  That's how I get paid.  I can't tell you what it says.  I don't know it.  I haven't read it.

Q.  Because you don't know what your responsibilities are in running DKCK, right?

A.  I don't what to -- I couldn't tell you.  I don't have a copy of the contract.  I don't know what it says in the contract.

Q.  So, you don't know what you are supposed to do without reading the contract, right?

A.  I don't know for sure what my specific responsibilities are, correct.

Q.  All right.  Where is your office?

A.  1417 Avenue J.

Q.  Is there any accounting software that

Page 191

DOVID KLEINER          THURSDAY, JUNE 18, 2026

you use to generate the tenant ledgers other than the --

A.  Rent Riter.

Q.  Was there one before?

A.  No.

Q.  DKCK runs the Rent Riter program, correct?

A.  Yes.

Q.  DKCK uses the Rent Riter program to generate the building statements, the tenant ledgers that it gives to the lawyers, right?

A.  Please repeat.

Q.  All right.  DKCK, operates the Rent Riter program, correct?

A.  Correct.

Q.  And the Rent Riter program generates the rent ledgers for the 1,500 tenants that you do property management services for, correct?

A.  Correct.

Q.  And the Rent Riter also generates the billing statements for the 1,500

Page 192

DOVID KLEINER          THURSDAY, JUNE 18, 2026

tenants that you do property management for, right?

A.  Yes.

Q.  And DKCK mails out those billing statements to the 1,500 tenants that it does the property management services for, right?

A.  I told you the terminology you are using, this and that is very vague.  It's a very vague thing for me to tell you what it is.

Q.  You sent that from your office at 1407 Avenue J?

A.  Is it coming from 1915 or is it coming from DKCK, I can't tell you how it should be.

Q.  Because you are saying it's the same people?  Is that what you are saying?

A.  Basically.

Q.  Approximately how many nonpayment petitions does DKCK direct the lawyers to file on behalf of the LLC's in a year?

A.  Based on balances, not how many, I



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
193–196

Page 193

DOVID KLEINER            THURSDAY, JUNE 18, 2026

can't tell you that.

Q.  Well, is there a certain balance that would be the threshold where DKCK would forward an account to the lawyers to file?

A.  No.  There is no clear definitive amount.

Q.  Is there a general rule of thumb about how much needs to be owed?

A.  No, there is no specific.

Q.  Just a general guideline?

A.  There is no rule.  The balance is too large, that's it.

Q.  You make that determination?

A.  Yes.

Q.  And tell me the steps that happen when you have a nonpayment petition started against one of the tenants of the 1,500 units that you do property management for.  Tell me what the steps of the process of that is.  Did you hear my question?

A.  No, I didn't hear your question.

Q.  Generally, just give me an overview

Page 194

DOVID KLEINER            THURSDAY, JUNE 18, 2026

about the steps that happen when you decide a nonpayment petition should be filed and what it actually is, just generally.

A.  I print out an outstanding balance.  I look at the balances and then I send it to the lawyer to start a case.

Q.  So, you e-mail the rent ledger to the lawyer to file --

A.  Correct.

Q.  You have to wait until I'm finished.  What about the demand?  How much do you tell the lawyer to put in the pre-suit demand?

A.  What is your question?

Q.  Do you generally give the ledger before or after the nonpayment petition is filed?

A.  Before.

Q.  Now, prior to the filing of the nonpayment petition, certain demand letters are sent to tenants, right?

A.  That's what legally has to be done.

Page 195

DOVID KLEINER            THURSDAY, JUNE 18, 2026

Q.  That's what you have done for the 1,500?

A.  I told you already four times or six times I give the ledger to the lawyer, he does whatever legally has to be done.  I don't get involved.

Q.  So, what I'm trying to get at is, sometimes the property management company sends out the pre-suit?

A.  I don't --

MR. BERRY:  Let him finish the question, David.

BY MR. KESHAVARZ

Q.  What I'm trying to get at is, sometimes the property management company sends out the pre-suit demand.  Sometimes the lawyer sends out the pre-suit demand.  I'm wondering did DKCK send out the pre-suit demand or does it have its lawyers do it?

A.  I assume it comes from the lawyer.  I don't know.  I don't think it comes from me.

Page 196

DOVID KLEINER            THURSDAY, JUNE 18, 2026

Q.  Well, if it was generated by DKCK, you would know, right?

A.  Not particularly.

Q.  Do you have a place where documents are sent to or referred from lawyers that have filed lawsuits against the 1,500 tenants that you do property management services for?

A.  Can you repeat?

Q.  Sure.  Let's say that there is a motion to dismiss a case because they say, hey, the tenant says, hey, I don't owe you any money.  That information as a general rule would be sent to you, right?

A.  No, it's sent to the lawyer.

Q.  No, but the lawyer says the tenant says, hey, I don't owe this money.  The lawyer would generally contact you to tell you what the correct amount is, right?

A.  No.

Q.  The lawyer independently makes a determination about the correct



Page 197

DOVID KLEINER          THURSDAY, JUNE 18, 2026

amount of the rent when a tenant files a motion to dismiss claiming that the rent wasn't owed?

MR. BERRY: Is that a question?

BY MR. KESHAVARZ

Q.  Is that correct?

A.  I don't hear the question.

Q.  In the ordinary course, when a tenant says in a lawsuit for the 1,500 tenants you do property management services for, when a tenant says, hey, I don't owe them money, does the lawyer contact DKCK to determine the correct balance?

A.  He has the ledger.  He works off the ledger.  I don't babysit him.

Q.  So the answer is no?

A.  I told you my answer.  My answer is the lawyer has the ledger.  You can decide if it's yes or no.

Q.  In this case my client filed a motion to dismiss on a motion for summary judgment claiming they did not owe

Page 198

DOVID KLEINER          THURSDAY, JUNE 18, 2026

any money.  Were you aware of that? Was DKCK aware of that?

MR. BERRY: Form.

THE WITNESS: I'm not sure.

BY MR. KESHAVARZ

Q.  When a tenant files a motion to dismiss or summary judgment claiming that the amount in the rent ledger that the lawyer has is in incorrect and as a regular course does the lawyer contact DKCK?

A.  Come to the lawyer, not me.

Q.  All right.
But if the lawyer -- the tenant files a motion to dismiss for summary judgment or says, hey, this ledger is wrong, I don't owe this money, as a regular course does the lawyer contact you to get the correct amount?

A.  He would call me, yes.

Q.  Then you make a determination about the correct amount that's actually owed, right?

Page 199

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  The lawyer makes a determination.  I give him the facts and the lawyer makes determinations.  I don't make determinations.

Q.  The rent ledger you provide to the lawyer is a standard generated form that you provide to the lawyers, right?

A.  Comes from the program.

Q.  Sorry?

A.  It comes from the program.

Q.  It's a standard generated form, is that true?

A.  Comes from the program.  I put in an apartment number and it prints it out.

MR. KESHAVARZ: All right. I think we're up to Exhibit G.

* * * * * * *

(Plaintiff's Exhibit G, Petition Non-Payment Dwelling document, Index No. LT-310915-25/BX,  consisting of 36 pages Bates stamped 1915_000053

Page 200

DOVID KLEINER          THURSDAY, JUNE 18, 2026

through 88 is marked for identification.)

* * * * * * *
* * * * * * * * *

(At which time, Plaintiff's Exhibit G was shown to the witness.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.  I'm pointing to a document states 1915-53 to 88, and my specific question is:  Is what I'm showing you, pages 75 through 79, is that the rent ledger generated by DKCK for the Batistas?

A.  Yes.

Q.  Where in the ledger, if anywhere, shows that my client had only owed $1.00 for the time period that there was a rent reduction?

A.  I see $1.00 over here.  I see $1.00 over there.  You said rent receipt.

Q.  Specifically I'm looking at page Bates stamped 77.  Now, for entries for January 17, 2024, February and



Page 201

DOVID KLEINER          THURSDAY, JUNE 18, 2026

all of the dates in February 2024, my client didn't actually owe the amounts that is being alleged per month, right?

A. I don't know.

Q. If the rent reduction order was, in fact, in place during those dates, you would know about it?

A. I don't know.

MR. KESHAVARZ: Wait until I finish the question.

MR. BERRY: Please, David. I'm really asking you again to let him finish the question. It's going to go a lot faster and the whole process is going to work a lot better if you let him finish the question and give me time to object. It's the only way I can protect you from questions that are improper form. If you don't do that, there is nothing I can do about it.

THE WITNESS: Go ahead.

Page 202

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Finish.

BY MR. KESHAVARZ

Q. So, the rent ledger that you, in fact, provided to the lawyers did not indicate that my client was only liable for $1.00 for the time period that the rent reduction order was in place, correct?

A. I don't have the record. I didn't read the order.

Q. Okay. Assuming the order was in place, the rent reduction order was in place sometime between January -- July 2022 through February 1, 2026, the rent reduction order was in place for some period of that time, right?

MR. BERRY: Can we see the rent reduction order?

MR. KESHAVARZ: I will get to that in a second.

BY MR. KESHAVARZ

Q. But the rent reduction order was in between that time period, right?

Page 203

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Somewhere in between?

MR. BERRY: If you remember.

A. I have no idea.

BY MR. KESHAVARZ

Q. When was the fire? When was the building collapse?

A. December 2023.

Q. The rental reduction order was right after?

A. I have no idea.

Q. It was soon after the building --

MR. BERRY: Objection. I don't understand why we're playing memory game now. If you have the reduction order, why don't you show it to him and ask him a question about it? Why is he being required to guess about something that you know the answer to already? If the rent reduction order presumably has a date on it, show it to him. Ask him questions about it.

Page 204

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q. Still going through Exhibit D, pointing your attention to pages Bates stamped 1915 - 81 and - 82 now, is this the rent reduction order for the Batistas?

A. I have no idea.

Q. Does it appear to be a rent reduction order?

A. I'm not sure.

Q. Have you ever seen a rent reduction order?

A. I have seen one.

Q. Okay.

A. This is an order determining maximum legal regulated rent.

Q. That it says the maximum amount that you can charge my client, right?

A. That's what you are saying. I haven't seen this document.

Q. Okay. Well, look at item number 1, Bates stamped page 81. You know how to read a rent reduction order, right?



Page 205

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: Form.

BY MR. KESHAVARZ

Q. Isn't that true?

A. It doesn't say from when to when.

Q. It says as of item number 4.

A. Right.

Q. You have to wait until I ask the question, please. Page Bates stamped 82, paragraph 4 establishes that the legal rent of $1.00 per month as of December 11, 2023, correct?

A. Correct.

Q. So, you can charge more for the period that this order is in effect. I appreciate you trying to answer the question, but it's important for the court reporter who is taking notes to be able to clearly have a record of the question and clearly have a record of the answer. So, my question is, according to a document Bates stamped 82 there is a rent reduction order that beginning on December 11, 2023, my client could

Page 206

DOVID KLEINER          THURSDAY, JUNE 18, 2026

not be charged by you more than $1.00 per month, correct?

A. I don't know.

Q. Is it correct by that statement?

A. Maybe it was restored by December 15th.

Q. Why? As of December 11, 2023, you can't charge more than $1.00.

A. No, it only started December 11th. Maybe December 15th it was restored and he wouldn't be entitled to $1.00 per month.

Q. Why don't you read the document with me and tell me if as someone in property management if you can tell me what period of time that you can only charge $1.00 a month to my client, looking at the page Bates stamped 81.

A. That's December 11th, resumed March 3rd. Doesn't mean it was restored December 15th. It still doesn't say that. It just says restored March 3rd.

Page 207

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q. It was December 11th it was instituted?

A. Correct.

Q. And it was -- vacate order was sent -- in your ledger it says my client made a credit of $1.00, payment. $1.00, that's because they were only liable for $1.00 for that month's rent, right?

A. No, it says it was reduced to $1.00 on December 11th. Doesn't mean on the 15 it wasn't restored. It says on March 15th resume occupancy. I would do probably for December and maybe they were restored December 15th and billed properly every month.

Q. All right. Is there anything in your billing statement that shows that my client was provided a rent credit of $2,500?

A. Well, repeat that.

Q. Where in the ledger does it reflect that you provided my client $2,500 credit as required by the lawsuit?

Page 208

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A. I don't agree with that statement. Have to review. I'm not going to review it now. I'm going to review it and see if they got it or not.

Q. I'm looking at it right in front you.

A. I don't have to review it now.

Q. I'm showing it to you right now.

A. Thank you.

Q. So, I'm scrolling through it. Where in the ledger, if anywhere, is there a reflection that you provided a $2,500 credit and applied that towards my client's share? Anywhere in the document that shows that?

A. I'm not looking at the document now.

Q. Take a look.

A. I will look at the document when I'm ready to look at the document.

MR. BERRY: He is not going to be able to take a close look.

MR. KESHAVARZ: You can take as long as you like.

* * * * * * * * *

(Brief pause while witness



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
209–212

Page 209

DOVID KLEINER          THURSDAY, JUNE 18, 2026

reviews document.)

     * * * * * * * * *

BY MR. KESHAVARZ

Q.  Have you looked at this top part now?
Have you looked at this page
(Indicating)?

     * * * * * * * * *

(Brief pause while witness
reviews document.)

     * * * * * * * * *

A.  I see $14,000.
Last time I checked it was a $14,000
balance and $2,500 credit, then I'm
still okay.
That's the way I look at it.  Nothing
for me to look at.

     * * * * * * * * *

(At which time, a discussion was
held off the record, after which
time the deposition resumed.)

     * * * * * * * * *

MR. BERRY: I'm calling you
now.

     * * * * * * * *

Page 210

DOVID KLEINER          THURSDAY, JUNE 18, 2026

(At which time, a brief recess
was taken, after which time the
deposition resumed.)

     * * * * * * * *

BY MR. KESHAVARZ

Q.  The rent reduction we're looking at,
Bates stamped number 81 of Exhibit G,
it indicates that the rent was
restored on January 4, 2024, right?
A.  Okay.
Q.  Is that what it indicates?
A.  Yes.
Q.  And then it was suspended on December
11, 2023, correct?
A.  December 11th.
Q.  So, from the time period of December
11, 2023 to June 4, 2024 you couldn't
charge more than $1.00, correct?
A.  I don't know the legal law.  If they
were living in December 1, they were
living in the apartment, I'm entitled
to charge rent.  I don't know.  So
maybe I wasn't entitled to bill for
January too.  I don't know the law.

Page 211

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  You know ledgers because you generate
them.  I'm trying to get to you say
the ledger shows everything, the
lawyer should know what the ledger
means.
So I'm asking you, looking at the
ledger -- the record is going to be
so muddled here -- were you just on
the rent reduction or is that on the
same document as this ledger?
MR. KESHAVARZ: Yes, all
Exhibit G.
MR. REYNARD: Perhaps when
you identify this document, just
mention the Bates number so if
we're reviewing this later on we
can actually see where we're
trying to look.
MR. KESHAVARZ: Good point.
MR. REYNARD: Thank you.
BY MR. KESHAVARZ
Q.  So, looking at Bates stamp number
1915 - 77 -- at the top for the
payments January from December -- was

Page 212

DOVID KLEINER          THURSDAY, JUNE 18, 2026

there a reduction in the amount
alleged to be owed in the ledger for
December 2023 and January 2024?
A.  I don't see it.
Q.  Okay.
So, you didn't communicate to the
lawyers via the rent ledger that my
client should only be charged $1.00
for that time period, right?
A.  I don't agree with that.
Q.  What about it don't you agree with?
A.  I don't know if I'm legally allowed
to charge.  Could be some of January.
I don't know if my ledger is wrong.
Q.  But you are the one who determines
what is put on the ledger?
A.  I said I don't know.
Q.  You are the one?
A.  No, it's computer generated
automatically.
Q.  And you are the one to determine that
the amounts owed in the computer
generated record are accurate?
A.  No.  I'm not a babysitter.



Page 213

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Well, I'm going to whatever you tell the lawyers the amount owed.

So what you are telling the lawyer is the amount owed, at least as reflected in the rent ledger, that includes Bates stamp number 77, what you are telling the lawyer what was owed was not accurate because it doesn't take into account the rent reduction order from December 11, 2023 to January 4, 2024, is that correct?

MR. BERRY: Objection to the form.

Do you understand the question?

BY MR. KESHAVARZ

Q.  Is that correct?

A.  What he is asking is if I was charging them the right amount or not.  I don't know.  He is saying they should be charged $1.00.  I don't know if he is right or not.  I can't answer.  I have no idea.

Page 214

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: If that's the answer, that's the answer.

THE WITNESS: That's it.  He keeps on repeating it.

MR. BERRY: You are not in a dialogue with him or me.  You are a witness.

This is an extension of the courtroom.  You should be conducting yourself as if you were in front of a jury.

Mr. Keshavarz gets to ask questions.  If I think they are in an inappropriate form, I will lodge an objection to form.  Most of the time I will tell you to answer them.  I want you to do your best to answer those that I tell you to answer.

THE WITNESS: No problem.

BY MR. KESHAVARZ

Q.  So, are you saying that since a rent reduction order in your view is a legal document, you don't know how to

Page 215

DOVID KLEINER          THURSDAY, JUNE 18, 2026

adjust a rent ledger to reflect the reduction in the rent reduction order?

Is that what you are saying?

MR. BERRY: Form.

THE WITNESS: I didn't say that.

BY MR. KESHAVARZ

Q.  Okay.

So, but in this case as to the Batistas, let me ask you straightaway, did you charge them from December 11, 2023 to January 4, 2024 the full contract rent?

A.  They were billed the full amount of rent from December 11th and January.

Q.  Can you please put your phone down.  You seem to be reviewing a document.  Are you looking at something on your phone?

A.  No, not at all actually.

Q.  So, why did you not update the ledger that you sent to your lawyer to reflect the actual amount that was

Page 216

DOVID KLEINER          THURSDAY, JUNE 18, 2026

owed for that time period?

A.  I meant to be as -- I don't know if I legally had the right to give them a reduction of rent.

Q.  Does your billing software allow you to make a determination about whether a rent credit is supposed to be applied to the tenant's share or the government's share?

A.  I see the Section 8 share and I see -- I'm not sure.

Q.  I'm trying to find that $2,500 credit.

A.  It was towards the end.

MR. BERRY: There is no question pending.

BY MR. KESHAVARZ

Q.  I thought so, too.

A.  It's right there.

Q.  All right.

So, thank you for that.

Question is Exhibit G, page Bates stamped number 78, the line entry number for the rent for February 12,



Page 217

DOVID KLEINER          THURSDAY, JUNE 18, 2026

2025, adjustment.

Do you see that entry?

A.  Yes.

Q.  Now, the above shows whether it's a Section 8 payment or a rent charge for the entry above it, right?

A.  Okay.

Q.  Is that true?

A.  I see it says, Section 8 payment.

Q.  Now, looking at the settlement, the rent adjustment of February 12, 2025, the ledger indicate whether that was applied to the tenant share or the Section 8 share, right?

A.  Right.

Q.  So the lawyer couldn't know whether the $2,500 should be charged to the tenant, correct?

A.  It's a balance.  The question is it's $2,500 credit for the apartment.  Doesn't say it comes off the tenant.  Doesn't say it comes off Section 8.

Q.  But the ledger on the right that says the balance, that's the balance that

Page 218

DOVID KLEINER          THURSDAY, JUNE 18, 2026

you are suing the client for, right, my client for?

A.  That's the balance on the account.

Q.  How was the information regarding the settlement that had a $2,500 rent reduction, how was that settlement communicated to you?

A.  I don't remember what the specifics were.

Q.  But you learned about it when on or about or soon after the settlement, you learned about it soon after that, right?

A.  I don't even know when the settlement was.

Q.  Whenever it was, you would have corrected your records right away to reflect the credit, right?

A   (No verbal/audible response from Witness to question posed by Counsel.)

Q.  Did you hear my question?

A.  I don't hear a question.  You made a statement.

Page 219

DOVID KLEINER          THURSDAY, JUNE 18, 2026

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: Whenever it was, you would have corrected your records right away to reflect the credit, right?)

* * * * * * * * *

MR. BERRY: Form.

MR. KESHAVARZ: You can answer.

THE WITNESS: I would credit when we had an opportunity to take care of it.

BY MR. KESHAVARZ

Q.  Turning back to Exhibit C, page 77, my question is:  When Section 8 stops paying for whatever reason, the ledger on page 77 just reflects there is no payment made at all, right?

A.  Which month are you looking at?

Q.  All the months on page 77.

A.  Okay.

Q.  There reflects that there are certain

Page 220

DOVID KLEINER          THURSDAY, JUNE 18, 2026

payments being made, but nowhere on 77 do you track whether the payment is being made by Section 8 or not, so, my question is during the time period on Exhibit 77 it just reflects that Section 8 hadn't been paying, right, does it?

A.  I see no payments on 77.

Q.  Well, let me just ask you this, if Section 8 stopped paying for whatever reason, and Section 8 was supposed to pay, your ledger would just reflect that there wasn't a payment, it wouldn't reflect whether Section 8 was supposed to pay or not?

A.  Correct, it will not say what the reason is.

Q.  And that's true for the way you generate ledgers generally, Section 8 stops paying, it would just reflect that the tenant owes an amount that includes the Section 8 share?  Is that correct?

A.  I don't hear your question, sir.  I'm



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
221–224

Page 221

DOVID KLEINER            THURSDAY, JUNE 18, 2026

sorry.

Q.  So, the practice of a property management company is that it doesn't matter the reason why Section 8 stops paying, if Section 8 just stops paying, that amount will be shown on the ledger as being owed by the tenant, is that correct?  Did you understand the question, sir?

A.  Definitely not.

Q.  So, my question is, when you generate a rent ledger, if Section 8 stops paying for any reason, and it doesn't matter what the reason is, Section 8 stops paying, your rent ledgers just generate and show that the tenant owes the full contract rent, right?

A.  Correct.

MR. KESHAVARZ: Going up to Exhibit H.

* * * * * * *

(Plaintiff's Exhibit H, Photocopy of a handwritten letter dated 06-30-24 to 1915 Realty LLC

Page 222

DOVID KLEINER            THURSDAY, JUNE 18, 2026

signed by Damian Batista, consisting of 2 pages Bates stamped 1915_000611 through 612 is marked for identification.)

* * * * * * *

MR. KESHAVARZ: This is a two-page document Bates stamped 1915 - 611 through 612.  This page is blank, so let me point your attention to the first page, page 611.

Why don't you read that and let me know when you are done and I will scroll down when you need me to.

This letter says, in part, that --

This is a letter that was produced by your office in response to discovery demands.

* * * * * * * * *

(At which time, Plaintiff's Exhibit H was shown to the witness.)

* * * * * * * * *

Page 223

DOVID KLEINER            THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  This is a document that your property management company had because you produced it, is that correct?

* * * * * * * * *

(Brief pause while witness reviews document.)

* * * * * * * * *

A.  This was a letter that was sent to my e-mail, yes.

BY MR. KESHAVARZ

Q.  (Reading from Document)
It says, in part, he is writing to see if you sent the lease renewal to Section 8 because it was Section 8 and they told me that a landlord had not yet sent the renewal of the lease.
Is that statement true?
Did you not, in fact --

A.  I did send it to Section 8 and I have proof that I sent it to Section 8.

Q.  As of that date?

A.  Yes.

Page 224

DOVID KLEINER            THURSDAY, JUNE 18, 2026

Q.  Now, I did not see any document reflecting that in your records.
What document, if there is a document reflecting that you, in fact, had sent the lease renewal?

A.  Copy of the lease.

Q.  Okay.
But is there any evidence that you actually sent the lease?

A.  I can't hear you.

Q.  Is there any indication in your records indicating when, if at all, that lease that's being reflected in Exhibit H was sent?

A   (No verbal/audible response from Witness to question posed by Counsel.)

Q.  Do you understand my question, sir?

A.  Please repeat it.

Q.  I didn't see anything in your document production that indicated that you actually mailed the lease renewal to Section 8 during this time period.



Page 225

DOVID KLEINER       THURSDAY, JUNE 18, 2026

Was there a document that you have that shows when, if ever, you sent that lease to Section 8?

A.  I will make a note and I will get it to the lawyer.

MR. BERRY: Ask the court reporter to leave a blank in the record and we'll provide an answer if we can.

**INFORMATION INSERT**

(INSERT)_____

_____

_____

* * * * * * * * *

BY MR. KESHAVARZ

Q.  Does your management company track the dates that it sends out leases to Section 8 and whenever it receives paperwork back, do you track those dates?

A.  I have to check with my office.

Q.  Your assistant, your regular assistant, is that --

A.  If it was printed out.

Page 226

DOVID KLEINER       THURSDAY, JUNE 18, 2026

MR. BERRY: Let him finish his question.

THE WITNESS: No problem.

BY MR. KESHAVARZ

Q.  My question is:  Is your system at the property management company that it tracks when you send something out to Section 8 such as a lease, the lease renewal?

A.  There is no tracking system.

Q.  So, you don't know when you, in fact, sent the lease renewal as to the Batistas, right, you don't know, you don't have any evidence to show when, if ever you sent the lease renewal to Section 8, right?

A.  I do have.

Q.  What?

A.  I have proof of mailing.

Q.  For this lease?

A.  Correct.

Q.  And what type of proof of mailing do you have?

A.  Certificate of mailing.

Page 227

DOVID KLEINER       THURSDAY, JUNE 18, 2026

Q.  Right.  And you produced that document to your attorney?

A.  I don't know if I did or not.  I don't know if I was asked for it, so I didn't know if it came up or he requested it or not.

MR. BERRY: Would you say what document you want us to produce and we'll get back to you.

MR. KESHAVARZ: I call for the production of any documents reflecting when you sent out correspondence to Section 8 and when you received it back, specifically including lease renewals, for Section 8 and specifically including the lease renewal reflected in document Bates stamped 611.

**REQUEST**

MR. BERRY: Thank you.

MR. KESHAVARZ: I also call for the production of any system

Page 228

DOVID KLEINER       THURSDAY, JUNE 18, 2026

that the company has generally to track correspondence coming in and going out, including Section 8.

**REQUEST**

MR. BERRY: Okay.  Thank you.

MR. KESHAVARZ: Now, going on to Exhibit I, which will be Bates stamped number 613; 614 which is a blank page; and 616 and 615, which is a certified mail envelope.

* * * * * * * *

(Plaintiff's Exhibit I, Photocopy of a handwritten letter dated 07-24-24 to 1915 Realty LLC signed by Damian Batista with photocopy of front and back of envelope reflecting document was sent via Certified Mail #7012 3460 0002 6783 1136, consisting of 4 pages Bates stamped 1915_000613 through 616 is marked for



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
229–232

Page 229

DOVID KLEINER          THURSDAY, JUNE 18, 2026

identification.)

\* \* \* \* \* \* \* \* \*

MR. KESHAVARZ: I'm going to scroll through this slowly.

\* \* \* \* \* \* \* \*

(Counsel scrolled through the exhibit for the witness and all parties.)

\* \* \* \* \* \* \*

(Brief pause while witness reviews document.)

\* \* \* \* \* \* \* \* \*

BY MR. KESHAVARZ

Q.  Is Exhibit I a letter that Mr. Batista sent to DKCK?

A.  Said it wasn't 1915 Realty.

Q.  But that is your P.O. box?

A.  Yes.

Q.  P.O. Box 40319 is the P.O. Box -- is a P.O. Box for DKCK, right?

A.  Correct.

Q.  So, the stamp on the envelope from the post office indicates that it was mailed on or about July 26th.

Page 230

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A.  What?

MR. BERRY: Let him finish the question.

THE WITNESS: I couldn't hear him.  I said that, what?

BY MR. KESHAVARZ

Q.  Looking at page 615, the envelope, and the postage indicates that it was postmarked on or about July 26, 2024. Based on your records does that indicate to you that's on or about the time that you received it, like shortly after that date?

A.  No idea.

Q.  But this is your records, right, from your business?

A.  It's a letter that you have shown me with an envelope.  I don't know when I got it.

Q.  Right now, because this has not been produced.

A.  Okay.

Q.  Is that not true?

A.  The lawyer requested whatever he

Page 231

DOVID KLEINER          THURSDAY, JUNE 18, 2026

requested again.

Q.  So, my question is:  Am I reading this letter correctly?

MR. KESHAVARZ:

(Reading from Document)

"My name is Damian and I live at 1915 Billingsley Terrace, Apartment 57, Bronx, New York 10435.  I'm writing to request from the landlord certification as proof stating that I have not moved out of the my apartment, that I continue to live in my apartment and that 1915 Billingsley Terrace, Apartment 57 is my address since June 2008.  Please send me the certification immediately because I need it urgently."

Did I read that correctly, sir?

A.  Possibly.

Q.  You want me to read it again?

A.  Yes.

Page 232

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.  Starting on page Bates stamp 613. "My name is Damian and I live at 1915 Billingsley Terrace, Apartment 57, Bronx, New York 10435.  I'm writing to request from the landlord certification as proof stating that I have not moved out of the my apartment, that I continue to live in my apartment and that 1915 Billingsley Terrace, Apartment 57 is my address since June 2008.  Please send me the certification immediately because I need it urgently."  Did I read that correctly?

A.  Yes.

Q.  Did DKCK provide the Batistas the proof of their continued residence since June 2008?

A.  I don't know.

Q.  If you had, you would have produced that proof in the discovery, right?

A.  No.  Maybe I didn't see it.  I have to look further.

MR. KESHAVARZ: Well, I call



Page 233

DOVID KLEINER          THURSDAY, JUNE 18, 2026

for production of anything indicating whether you, in fact, sent any proof to the Batistas of their continuing residence.

**REQUEST**

MR. BERRY: We'll take it under advisement.  Thank you.

MR. KESHAVARZ: Going to Exhibit J, Bates stamped 617 through 618, the second page appearing to be blank.

* * * * * * *

(Plaintiff's Exhibit J, Photocopy of a handwritten letter dated 10-11-24 to 1915 Realty LLC signed by Damian Batista, consisting of 2 pages Bates stamped 1915_000617 through 618 is marked for identification.)

* * * * * * *

MR. KESHAVARZ:
(Reading from Document)
Again it's asking, "My name is Damian Batista and I live at

Page 234

DOVID KLEINER          THURSDAY, JUNE 18, 2026

1915 Billingsley Terrace, Apartment 57, Bronx, New York 10455.  I'm writing because Section 8 asked me to request a letter from the landlord informing them of the collapse of the building, 1915 Billingsley Terrace, Bronx, New York which occurred in December 2023 and of the order to vacate the Apartment 57.  Please send to me as soon as possible so I can send it to Section 8."

* * * * * * * * *

(Brief pause while witness reviews document.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.  Did I read that correctly?

A.  Yes, you did.

Q.  Did DKCK, in fact, provide Mr. Batista the information that he requested in Exhibit J?

A.  I have to check.

Page 235

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. KESHAVARZ: I call for the production of any response and what that might be.

**REQUEST**

MR. KESHAVARZ: Going on to Exhibit I --
Showing what has been marked as Exhibit J.

MR. REYNARD: The last one was J.  This should be K.

MR. KESHAVARZ: Thank you. Exhibit K.

* * * * * * *

(Plaintiff's Exhibit K, Series of documents, consisting of 4 pages Bates stamped 1915_000619 through 622 is marked for identification.)

* * * * * * *

* * * * * * * * *

MR. KESHAVARZ: Showing you what has been marked as Exhibit K, Bates stamped number 619 through 622, reading the first page, 619.

Page 236

DOVID KLEINER          THURSDAY, JUNE 18, 2026

* * * * * * * * *

(At which time, Plaintiff's Exhibit K was shown to the witness.)

* * * * * * * * *

MR. KESHAVARZ: You could read that to yourself.

* * * * * * * * *

(Brief pause while witness reviews document.)

* * * * * * * * *

BY MR. KESHAVARZ

Q.  Did you take the action requested on page 619?

A.  I will find out.

MR. BERRY: Maybe I misheard the question.

* * * * * * * * *

(As requested, the Court Reporter read the previous QUESTION into the record: Did you take the action requested on page 619?)

* * * * * * * * *

MR. BERRY: Is the answer you don't know?



Page 237

DOVID KLEINER          THURSDAY, JUNE 18, 2026

THE WITNESS: It's like I answered the last few times.  You should mark it down and you will find out.

MR. BERRY: The answer is, sitting here today you don't know, is that correct?

THE WITNESS: Yes, I don't know.

MR. BERRY: So we'll undertake the finding so we'll leave a blank in the record for you to leave an answer.

We'll leave a blank in the record.

**INFORMATION INSERT**

(INSERT)_____

_____

_____

* * * * * * * * *

BY MR. KESHAVARZ

Q.  At the end of the nonpayment case against my clients, your attorneys filed, executed a stipulation that

Page 238

DOVID KLEINER          THURSDAY, JUNE 18, 2026

the petition had been satisfied.  They wouldn't have done that unless you authorized it, right?

A.  I don't hear you.

Q.  At the end of the nonpayment case that you filed against my clients, there was a stipulation by lawyers saying that the petitioner was satisfied.  Did you realize that?

A.  I believe --

MR. BERRY: Form.

Go ahead.

THE WITNESS: I believe you.

BY MR. KESHAVARZ

Q.  Did you authorize the attorneys to sign the stipulation?

A.  I don't recall.

Q.  If the stipulation says the petitioner was satisfied, do you understand that to mean that the amount alleged in the complaint in the petition was actually paid?

A.  No.

Q.  What is your understanding of what

Page 239

DOVID KLEINER          THURSDAY, JUNE 18, 2026

that means?

A.  Cost of doing business.  Settlement.  Doesn't mean anything.

Q.  When you say it's the cost of doing business, it's a settlement, what do you mean by that?

A.  Sometimes you have to waive money, even if you are owed money.

Q.  So, from your understanding, that means that my client didn't owe you any rent as of the date of the signing of that stipulation, is that correct?

A.  No, not at all.

Q.  What do you believe it means then?

A.  That I made a settlement instead of fighting, just waived the money.

Q.  But at that point my client would not owe any rent to you, is that right?

A.  I don't know.

Q.  After this lawsuit was filed, according to the public records, suits in the name of 1915 were starting be filed by a different law

Page 240

DOVID KLEINER          THURSDAY, JUNE 18, 2026

firm named Lazarus Karp car and Ehrlich, is that correct?

A.  Repeat the question, please.

Q.  Did you stop using the Edelman firm and start using a firm called Lazarus Karp after this federal lawsuit was filed?

A.  No.

Q.  But currently you use Lazarus Karp car to file nonpayment petitions, correct?

A.  I use Lazarus Karp.  I use Edelman Schwartz.

Q.  So the question is for the new lawsuits that you filed on behalf of the LLC's, what law firm do you use?

A.  Both.

Q.  Both being which?

A.  Edelman & Schwartz and Lazarus.

Q.  Did use Karp and Lazarus prior to this FD CPA suit being filed?

A.  Sure.

Q.  Currently for new cases, which firm do you give more cases to, Lazarus



DOVID KLEINER                                                June 18, 2026
BATISTA vs EDELMAN SCHWARTZ PLLC                             241–244

Page 241

DOVID KLEINER         THURSDAY, JUNE 18, 2026

Karp or Edelman Schwartz?

A.  Give both.

Q.  But for the LLC's that you file suit for?

A.  I said I give both.

Q.  Which one do you use more?

A.  I have look into it.

Q.  Just off the top of your head you don't know which one you might use more than the other?

A.  No.

Q.  Did you understand my question?

A.  I use both.

Q.  I guess what I'm trying to figure out is just sitting here today do you know roughly if you use one more than the other currently?

MR. BERRY: It's been asked and answered.

MR. REYNARD: It's been asked and answered.

THE WITNESS: Use both, like I said.

Page 242

DOVID KLEINER         THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.  My question is:  Do you use one more than the other of the new suits that you filed?

MR. BERRY: Do your best to answer the question.

THE WITNESS: I can't say for sure what I do.

BY MR. KESHAVARZ

Q.  You don't know?

A.  I don't know offhand.

Q.  That is fine.  That is all I was asking?

MR. REYNARD: He already said that.

BY MR. KESHAVARZ

Q.  Has the amount of work that you give to Edelman Schwartz changed at all since this FD CPA suit?

A   (No verbal/audible response from Witness to question posed by Counsel.)

MR. KESHAVARZ: You are on mute, sir.

Page 243

DOVID KLEINER         THURSDAY, JUNE 18, 2026

Did you hear the question?

THE WITNESS: I'm sorry.  It keeps on muting.  I apologize.  Question was if I use Edelman and Schwartz less than I use Karp now?

MR. KESHAVARZ: Yes.

THE WITNESS: I have to think about it.  I don't know.

MR. KESHAVARZ: That's fair enough.  We can leave a blank here and see if you can find out.

**INFORMATION INSERT**

(INSERT)_____

_____

_____

* * * * * * * * *

THE WITNESS: Yes.

BY MR. KESHAVARZ

Q.  All right.  Has your property management company changed the way it does business in any way, shape or form after this lawsuit was filed?

Page 244

DOVID KLEINER         THURSDAY, JUNE 18, 2026

THE WITNESS: I want to go off the record for a minute.

MR. KESHAVARZ: You can't.  You have to answer the question.

THE WITNESS: Okay.  Not a problem.

BY MR. KESHAVARZ

Q.  Go ahead.

A.  Possibly.

Q.  The question now is did you change the way you operate DKCK as a result of the filing of this suit?

A.  No.

Q.  So, when you authorized the discontinuation of my client's suit, did you believe, in fact, that my client owed the money alleged?

A.  Not personally, so I didn't really get into it.

MR. BERRY: Listen to the question and give us a succinct answer.

THE WITNESS: Okay.



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
245–248

Page 245

DOVID KLEINER          THURSDAY, JUNE 18, 2026

BY MR. KESHAVARZ

Q.   Up to that point and during the loss nonpayment petition lawsuit against my client, did my client actually owe you any money?

A.   I definitely don't know right now off my head.

MR. KESHAVARZ: I ask a line to fill in if you can answer the question of when you sued my client and during the course of the lawsuit, in fact, whether my client owed any money.  If you will answer that question.

**INFORMATION INSERT**

(INSERT)_____

_____

_____

* * * * * * * * *

MR. BERRY: Can you say your best understanding at this point, David?

THE WITNESS: I honestly don't know.

Page 246

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. KESHAVARZ: Okay.

MR. BERRY: Hadn't been determined by the Civil Court?

I'm asking Ahmad.

MR. KESHAVARZ: There was a stipulation that the petition says.

I was asking you, I'm not asking for a court order.

MR. REYNARD: It isn't the setting to pose interrogatories that are beyond the scope of what is allowed in the Southern District.  He answered the question.

MR. BERRY: You got the answer you are entitled to.  You may be disappointed with it, but I think that's the answer.

BY MR. KESHAVARZ

Q.   To make sure I'm clear, when you filed suit against my client, did my client owe any money?

A.   I assume so.

Page 247

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.   Why do you assume so?

A.   I assumed the lawyers is not going to start a case if you don't owe money.

Q.   All right.
     The rent ledger that you sent to lawyers saying that my client owed you a certain amount of money, looking back on it with all the information you have know now, was that ledger accurate?

A.   Yeah.

Q.   If you had to do it all over again, based on everything you know today, would you have still filed a nonpayment petition against my clients that you did?

A.   I would research it maybe a little bit more before I have would do it.

Q.   Why?

A.   What?

Q.   Why?

A.   Because you educated me.

Q.   In what way?

A.   Section 8 share, tenant share.

Page 248

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Q.   So, because of the deposition you think that my client might not have owed you the money in whole or in part that you sued him for?

A.   I didn't say that.

Q.   I'm asking you.

A.   I didn't say that.  You made a statement.  I didn't say that.

Q.   So, my question is, based on everything you know now, all of the documents you produced in the case, everything you know about what happened, would you still have filed the rental arrears lawsuit against my client?

A.   Possibly.

Q.   And sitting here today, do you believe that, in fact, my client is owed money by the landlord?

A.   I don't know.

Q.   Did DKCK on behalf of the various LLC's ever file a nonpayment petition for the government's share of Section 8?



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
249–252

Page 249

DOVID KLEINER            THURSDAY, JUNE 18, 2026

A.  No.

Q.  I can't hear you.

A.  I assume so, but I don't know. That's the lawyer's decision who he sues.

Q.  Right, but, you provide the ledgers to the lawyer.

A.  And the lawyer makes that decision who he sues.

Q.  Okay. Well, you run DKCK, you know everything about DKCK, just asking you, have you ever directed a suit to be filed for one of the LLC's that you do property management for when, in fact, the amount sought in the suit was, in fact, the government's share of the rent in whole or in part?

A.  My answer still doesn't change.

Q.  Do you know if it happened or not?

A.  I have no idea what the difference is, who would they sue, who they don't sue.

Page 250

DOVID KLEINER            THURSDAY, JUNE 18, 2026

Q.  Well, at this point, knowing everything you know about the Batistas, all of the documents you produced in this case, all of the allegations in the complaint and the proof, my question is this, was at least part of the money that you sued my clients for, in fact, the government's share of Section 8?

A.  I don't know.

Q.  Have you determined whether, in fact, that you sued my client for the government's share of Section 8?

A.  Definitely don't know that.

Q.  You don't know if you made attempts to determine that?

A.  I didn't determine anything.

Q.  Did you attempt, since this lawsuit was filed, to determine whether, in fact, you had sued my clients for the Section 8 share of the rent?

        MR. BERRY: Objection. Attorney-client privilege. Don't answer the question.

Page 251

DOVID KLEINER            THURSDAY, JUNE 18, 2026

        * * * * * * * * *

        (As requested, the Court Reporter read the previous QUESTION into the record: Did you attempt, since this lawsuit was filed, to determine whether, in fact, you had sued my clients for the Section 8 share of the rent?)

        * * * * * * * * *

        MR. BERRY: Attorney-client communication.

BY MR. KESHAVARZ

Q.  Let me ask you this:  You got a copy of the lawsuit, right?

A.  What?

Q.  You got a copy of the FD CPA lawsuit, right?

        MR. BERRY: He means the Complaint.

        THE WITNESS: Yes.

BY MR. KESHAVARZ

Q.  And they allege that you sued my clients for rent they didn't owe, right?

Page 252

DOVID KLEINER            THURSDAY, JUNE 18, 2026

        MR. BERRY: David, did you think that is a fair characterization of the complaint?

        THE WITNESS: It's not a question.

        MR. BERRY: I would appreciate it be asked.

BY MR. KESHAVARZ

Q.  Was it your understanding that when you were sued that the Batistas were alleging that you were suing them for rent not owed? Is that your understanding?

A.  No.

Q.  What was your understanding?

        MR. BERRY: Objection. Give me a chance.

BY MR. KESHAVARZ

Q.  Prior to retaining an attorney.

        MR. BERRY: Withdraw the question and ask one question, and when you are done asking the question, David, don't answer it.



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
253–256

Page 253

DOVID KLEINER          THURSDAY, JUNE 18, 2026

Give me a chance to listen to it, okay?

THE WITNESS: No problem.

\* \* \* \* \* \* \* \* \*

(As requested, the Court Reporter read the previous QUESTION into the record:

What was your understanding? Prior to retaining an attorney.)

\* \* \* \* \* \* \* \* \*

MR. BERRY: If you looked at the Complaint before you spoke to me about it and had an understanding that predates our first conversations, you can tell him what it is.

THE WITNESS: I did not read the Complaint in total. I can't tell you about that charges the Complaint was.

BY MR. KESHAVARZ

Q. Prior to suing my client, did you take any steps to determine whether Edelman Schwartz had previously filed

Page 254

DOVID KLEINER          THURSDAY, JUNE 18, 2026

suits against tenants for rent they did not owe?

MR. BERRY: You can answer that yes or no.

THE WITNESS: Am I supposed to know what Edelman and Schwartz did?

MR. BERRY: Listen to the question, and answer yes, no, or I don't know.

BY MR. KESHAVARZ

Q. Prior to suing my clients did you take any steps to determine whether Edelman Schwartz had sued tenants for rent they did not owe?

A. I don't know.

MR. BERRY: What was your answer?

THE WITNESS: I don't know what I did. I don't remember. I don't recall.

MR. BERRY: Okay.

BY MR. KESHAVARZ

Q. What is the income of 1915 Realty?

Page 255

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. BERRY: Form.

BY MR. KESHAVARZ

Q. For let's say this year.

A. I have no idea.

Q. What is the income for DKCK this year?

A. I have no idea.

Q. Who does the bookkeeping? Who is your accountant for DKCK?

A. William Fomfeeder.

Q. Is he with a firm or is he a solo?

A. Solo.

Q. Where is his office?

A. His office is in Manhattan somewhere.

Q. Fair enough. Does he do the accounting for all of the LLC's that you do property management for?

A. No.

Q. He does it for 1915 Realty?

A. Yes.

Q. Does he do it for Phelan?

A. He is going to do it for Phelan.

Q. Is he going to do the accounting for you personally?

Page 256

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A. Yes.

Q. Does he do the tax filings for you?

A. Yes, he does.

Q. And DKCK?

A. Yes.

Q. And 1915?

A. You asked that already. Yes again.

Q. What are the assets of 1915 Realty? About how much?

A. Seven million in debt.

Q. That's because of a mortgage on the mortgage?

A. No, with the mortgage it's probably ten, eleven.

Q. Why is that? Why is it $7,000,000 in debt?

A. Due to the collapse.

Q. What about Phelan? What is the assets of Phelan?

A. Zero.

Q. And what are the assets of DKCK?

A. Zero at the end of the year.

Q. Because you pay out the money, the money gets paid out to the owners?



Page 257

DOVID KLEINER          THURSDAY, JUNE 18, 2026

A. No, not at all.

Q. Where does it get paid out to?

A. Expenses.  Expenses the last two years, no profits.

Q. How much do you make a year?

A. I don't know offhand, but I know that my accountant says you have been losing money instead of making money. The expenses are way to high.

Q. What is the gross income?

A. I have no idea.

MR. BERRY: Asked and answered.

MR. KESHAVARZ: Why don't we take a break or do you want to break for rest of the day?  I need a few minutes.

MR. BERRY: Sorry about the late start.  Starting at 10:00 became 10:35.

We were never going to get the full seven hours in one day. And this has been more tiring than I thought it was going to

Page 258

DOVID KLEINER          THURSDAY, JUNE 18, 2026

be, even for me, so I can only imagine what it's like for David and so why don't we quit now.

THE WITNESS: Unless he is going to use another 15 minutes and we're done forever.

MR. KESHAVARZ: Why don't we take a break.

Adjourn the deposition, and if we need to come back, we'll come back.  That will probably make the most sense.

MR. BERRY: Okay.

So you will be letting us know what your plans are?

MR. KESHAVARZ: As soon as I can.

MR. BERRY: Okay.

Fine.  All right.

MR. KESHAVARZ: So the deposition is adjourned.

MR. BERRY: Okay.

I will like normal delivery of the transcript.

Page 259

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. KESHAVARZ: Off the record.

* * * * * * * * *

(At which time, a discussion was held off the record, after which time the deposition resumed.)

* * * * * * * * *

THE REPORTER: Mr. Reynard and Ms. Spencer, are you ordering?

MR. REYNARD: What is the normal delivery?

THE REPORTER: Ten business days.

MR. REYNARD: That's fine.  I will do the same.

MS. SPENCER: I can look at your copy, right, I don't need my own copy?

MR. KESHAVARZ: I will get a copy, and e-trans PDF.  I don't need hard copies.

MR. BERRY: Yes, please, no hard copies.

Page 260

DOVID KLEINER          THURSDAY, JUNE 18, 2026

MR. REYNARD: Is there, like, an order form or something you could send over to the people on this?  I certainly don't need hard copies either, but I guess we would want what I call mini script and manuscript.

MR. BERRY: It comes with a mini script.

* * * * *

(Whereupon, the examination of DAVID KLEINER concluded at 4:54 p.m.)



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
261–264

Page 261

LAWYER'S NOTES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Page 263

DEPONENT'S CERTIFICATE

STATE OF_____:

COUNTY/CITY OF_____:

Before me, this day, personally appeared DAVID KLEINER, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

DAVID KLEINER

Signed and subscribed to before me this____day of_____,20____.

_____

NOTARY PUBLIC, STATE OF NEW YORK

Page 262

This is the Deposition of
DAVID KLEINER
taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will be reading and signing the transcript of said deposition.

Page 264

DEPONENT'S DECLARATION

DECLARATION UNDER PENALTY OF PERJURY

I, DAVID KLEINER, declare, under penalty of perjury, that I have read the entire transcript of my Deposition taken in the above-captioned matter, or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath. I would like changes made to my deposition transcript as indicated on the following page.

Signed on the _____day of _____, 20___.

_____

DAVID KLEINER



DOVID KLEINER
BATISTA vs EDELMAN SCHWARTZ PLLC

June 18, 2026
265–267

Page 265

ERRATA SHEET

INSTRUCTIONS:  After reading the transcript of your testimony, please note any change, addition or deletion on this sheet.  DO NOT make any marks or notations on the actual transcript.

WITNESS:  DAVID KLEINER

JOB NO.:  J15022599

CASE NAME:  DAMIAN BATISTA AND SANDRA BATISTA v EDELMAN SCHWARTZ PLLC, ZEV SCHWARTZ, 1915 REALTY LLC, BINOYMIN HERZL, AND YONAH ROTH

HELD:  THURSDAY, JUNE 18, 2026

Page    Line                CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature_____Date_____

DAVID KLEINER

Page 266

ERRATA SHEET

Page    Line                CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature_____Date_____

DAVID KLEINER

Page 267

REPORTER'S CERTIFICATION

I, MICHELLE TROY PARRISH, Court Reporter, do hereby certify that I recorded stenographically the proceedings herein at the time and place noted in the heading hereof, and that the foregoing transcript is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand.

*Michelle Troy Parrish*

MICHELLE TROY PARRISH

